(No. 31330.—Writ awarded.)

THE PEOPLE *ex rel.* MAX BERNAT, Petitioner, *vs.* FRANK H. BICEK, Judge, *et al.,* Respondents.

*Opinion filed March 22, 1950.*

DENEEN & MASSENA, of Chicago, (PAUL R. SCHREIBER, and DWIGHT W. CROESSMAN, of counsel,) for petitioner.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (WILLIAM C. WINES, GORDON B. NASH, MELVIN F. WINGERSKY, and PETER G. KUH, all of Chicago, of counsel,) for respondents.

CHARLES LEVITON, of Chicago, *amicus curiae.*

Per CURIAM: The People of the State on the relation of Max Bernat, a resident and taxpayer of the city of Chicago and the county of Cook, filed a petition for *mandamus* in this court, conformably to leave granted, against the Auditor of Public Accounts, the Secretary of State and the judges of the circuit and superior courts of Cook County to expunge from the public records a resolution adopted by the judges on September 19, 1949, creating a Divorce Division for the judicial circuit of Cook County and filed thereafter in the offices of the Auditor and the Secretary of State. The resolution, to the extent relevant, is as follows: "Be it resolved, the undersigned, being a majority of the Judges of the Circuit and Superior Courts of Cook County concurring therein, that there be and there is hereby established in the Judicial Circuit of Cook County a Divorce Division." Defendants answered the petition, their answer has been treated as a motion to strike, and, upon these pleadings, the cause is submitted.

By appropriate allegations, petitioner challenges the constitutional validity of Senate Bill No. 307 entitled, "An Act concerning the interest of the State in the domestic relations of the people, and to provide for the establishment of agencies and instrumentalities to aid the courts in the protection of that interest in actions for divorce, separate maintenance and annulment of marriage, and to make appropriations therefor," enacted June 30, 1949, approved July 25, 1949, and effective December 1, 1949. (Laws of 1949, p. 730; Ill. Rev. Stat. 1949, chap. 37, pars. 105.19-105.36.) A companion measure, Senate Bill No. 308, amends section 6 of "An Act to revise the law in relation to divorce," by incorporating Senate Bill No. 307 into the Divorce Act by reference. (Laws of 1949, p. 735; Ill. Rev. Stat. 1949, chap. 40, par. 7.) In like manner, Senate Bill No. 309, amends section 1 of "An Act in relation to married men and women," by incorporating Senate Bill No. 307 into

and expressly making it a part of the statute. (Laws of 1949, p. 1028; Ill. Rev. Stat. 1949, chap. 68, par. 22.) The same allegations are made with respect to the two companion acts, Senate Bills Nos. 308 and 309, implementing Senate Bill No. 307. Their validity is dependent upon the constitutionality of Senate Bill No. 307, and further reference to Senate bills Nos. 308 and 309 is not required.

Section 1 of Senate Bill No. 307, hereafter referred to as the Domestic Relations Act, contains a statement of the purpose motivating its enactment to serve as a guide to its interpretation and application. The declaration of policy is identical with the declaration of policy contained in the unconstitutional Domestic Relations Act of 1947. (*Hunt v. County of Cook,* 398 Ill. 412.) The laudable objective of this act, as of its predecessor, is the correction, in part, of the social and economic evils attending the disrupting of basic family relationships by actions for divorce, separate maintenance and annulment of marriage. To accomplish this goal, the present statute, as did the act of 1947, provides for the creation of a Divorce Division with abundant authority to ascertain the possibility of effecting reconciliations, to make independent investigations regarding alimony, child custody and support, and to aid in the enforcement of orders for the payment of alimony and child support.

Section 2 provides for the creation, in each judicial circuit of the State, of a Divorce Division in aid of the powers, functions and duties of the judges of all courts in each circuit exercising jurisdiction in actions for divorce, separate maintenance and annulment of marriage. In any judicial circuit in which there exists a superior court, a Divorce Division, it is further provided, shall be created jointly in the circuit and superior courts. Section 2 declares: "The establishment of a Divorce Division in any such judicial circuit shall be effected by the adoption of a resolution, concurred in by all or a majority of the Circuit

Court judges and Superior Court judges, as the case may require. Such resolution shall be attested by the Clerk of the Circuit Court in judicial circuits in which there are no Superior Courts, and by the respective clerks of the Circuit and Superior Courts. The original of such resolution and attestation shall be transmitted by the clerk or clerks of such courts to the Auditor of Public Accounts of the State of Illinois. Duplicate originals thereof shall be transmitted by such clerk or clerks to the Office of the Secretary of State for filing therein and upon such filing the Divorce Division shall be deemed created in such respective judicial circuits."

Section 3 provides for the appointment of masters in chancery by the circuit court of each judicial circuit in which a Divorce Division is created for the performance of the duties and functions of the Divorce Division, as authorized by section 1 of "An Act concerning masters in chancery." (Ill. Rev. Stat. 1949, chap. 90, par. 1.) Where a superior court exists, the number of masters in judicial circuits shall be four, two of whom shall be appointed by the circuit court and two by the superior court. Where no superior court exists, the circuit court of each judicial circuit shall appoint one master. Section 4 fixes salaries of the masters.

Section 7 provides that the judges of all courts in any judicial circuit exercising jurisdiction in actions for divorce, separate maintenance and annulment of marriage, are empowered to make and, from time to time, alter and amend rules, not inconsistent with the statute, as in their judgment may be necessary and proper for the purpose of fully effectuating the objects of the statute and for the governance of the Divorce Division. Such rules, section 7 also provides, upon adoption by all or a majority of such judges, shall be binding upon and govern all courts exercising such jurisdiction within the respective judicial circuits.

Section 9 provides that every complaint for divorce, separate maintenance and annulment of marriage filed after the effective date of the act, and every petition relative to custody of children, alimony, child support, attorney's fees, or for a rule to show cause for failure to comply with any order of a court in respect of such matters, relating to actions for divorce, separate maintenance or annulment of marriage filed either before or after the effective date, may be referred by the court to the Divorce Division for investigation, hearing and recommendation, under the general rules provided therefor or by such special order as the court may direct. Each master in the Divorce Division is authorized to cause to be investigated, and to hear and make recommendation to the court, any matter referred to it by such court under the statute.

Section 10 declares that, in any action or proceeding where the rights of minor children are involved, the court's files shall be impounded for a period of at least thirty days after the complaint is filed. Section 11 deals with the matter of notice to parties to appear before the Divorce Division where proper service has been had upon the parties to any action or proceeding involving minor children or alimony.

Section 12 provides that, in any hearing by the Divorce Division, the master shall ascertain the possibility of effecting a reconciliation of the parties, and, where deemed feasible, may invite the assistance of representatives of the religious denominations to which the parties belong. Section 13 grants authority to the master to verify the employment and earnings of the parties, take evidence regarding the financial and marital history of the parties and their condition in life and circumstances, and evidence regarding alimony, child custody and support and attorney's fees. This section also grants authority to cause an investigation to be made of all matters relating to the inquiry before the

master and for reference of any such matter to an appropriate welfare agency for investigation and report.

Section 15 provides that, unless the court directs otherwise, the payment of alimony and child support shall be made to the Divorce Division for disbursement to the persons entitled thereto, and the court may by its rules make provision for the carrying out of its order regarding such payment. Section 16 provides that the court may require any person or agency to whom custody of a child or children has been awarded to submit reports to the Divorce Division concerning the welfare of the child or children, at such times and in such manner as the court directs.

The provisions of sections 9, 10, 11, 12, 13, 15 and 16, as well as the provisions of several other sections, are the same as those of the corresponding sections of the act of 1947.

By his petition for a writ of *mandamus,* the petitioner, Bernat, charges that the Domestic Relations Act violates numerous provisions of the Federal and State constitutions and, in particular, that sections 2, 4, 7, 10, 11, 12 and 15 contravene constitutional guaranties and inhibitions in the respects enumerated. Defendants interposed general and special demurrers to the petition, averring that the statute is valid and constitutional in all respects, and that the action of the judges of the circuit and superior courts of Cook County in adopting the resolution creating a Divorce Division for the judicial circuit of Cook County is valid and proper.

The Chicago Bar Association has been granted leave to intervene in support of the validity of the statute and appears by *amicus curiae.*

Initially, we are impelled to make the observation that the individual members of this court may well agree with the social philosophy upon which the statute is predicated, but no power is vested in us to inquire into or pass upon the wisdom or the desirability of the public policy which

the statute proclaims. That function is legislative. Our inquiry is whether the legislation assailed squares with constitutional guaranties and, conversely, whether it violates constitutional prohibitions.

The first contention requiring consideration is that sections 2, 7, 11 and 15 of the Domestic Relations Act improperly delegate legislative powers to the judiciary in contravention of article III of our constitution. In dividing the powers of government in this State into three separate and distinct departments, article III is declaratory of one of the basic principles of constitutional law, both Federal and State. Each of the three departments is to perform the duties assigned to it and no department may exercise the powers properly belonging to either of the other two. (*Borreson* v. *Department of Public Welfare,* 368 Ill. 425; *Parks* v. *Libby-Owens-Ford Glass Co.* 360 Ill. 130.) As Mr. Justice Cartwright observed in *People ex rel. Breckon* v. *Board of Election Comrs.* 221 Ill. 9, "The legislature must decide what the law shall be, and the power delegated to that department by the constitution cannot be again delegated to any other body or authority." An act which vests any person with arbitrary discretion to determine what the law shall be in a particular situation is invalid. (*North* v. *Board of Education,* 313 Ill. 422.) The ultimate operation of a law may, however, by its own terms be made to depend upon a contingency, such as the affirmative vote of the electors in a given district or upon the action of some municipality, commission or other public agency named in the act. (*Rouse* v. *Thompson,* 228 Ill. 522.) Although the General Assembly cannot divest itself of its inherent function to decide what the law shall be, it may authorize others to do those things which it might properly but cannot understandingly or advantageously do itself. (*Lydy* v. *City of Chicago,* 356 Ill. 230; *Welton* v. *Hamilton,* 344 Ill. 82; *Block* v. *City of Chicago,* 239 Ill. 251.) The fundamental distinction is between a delega-

tion of power to make the law, which involves a discretion as to what the law shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; the latter is unobjectionable. 1 Lewis's Sutherland on Stat. Const. 2d ed., sec. 88; *Lydy* v. *City of Chicago,* 356 Ill. 230; *Welton* v. *Hamilton,* 344 Ill. 82; *Sheldon* v. *Hoyne,* 261 Ill. 222; *Arms* v. *Ayer,* 192 Ill. 601.

Section 2 of the statute grants power to the judges of the circuit and superior courts of Cook County to determine whether a Divorce Division shall be created in the judicial circuit of Cook County. In like fashion, power is given to the judges of the circuit court of each of the other judicial circuits of the State to decide whether a Divorce Division shall be established. The statute does not purport to create a Divorce Division for the judicial circuit of Cook County and the other seventeen circuits but, instead, reflects an abrogation of power by the legislature to the judiciary. In short, the judges may, in their discretion, decide whether the Domestic Relations Act shall be the law in their judicial circuits. Again, the judges of the circuit and superior courts of Cook County and the judges of the circuit courts in the other judicial circuits may determine whether to create or to not create a Divorce Division and thereby impose their judgment upon city courts within the territorial boundaries of the judicial circuits. Although city courts have jurisdiction to hear and try divorce cases, and, in some judicial circuits, the city court judges outnumber the judges of the circuit court, city court judges are granted no vote in determining the feasibility of establishing a Divorce Division. On the other hand, in the judicial circuit comprising Cook County there are twenty-eight judges of the superior court and twenty judges of the circuit court who far outnumber the two judges of the city courts within Cook County. Determination of whether divorce divisions shall be established in judicial circuits of the State is a legis-

lative and not a judicial function. Since the statute grants to the judges of the superior and circuit courts the option of adopting or rejecting the Domestic Relations Act, it is, for all practical purposes, a delegation of legislative power, and not "slightly in the 'twilight zone,' " as *amicus curiae* asserts. We recur to our observation in *Borreson* v. *Department of Public Welfare,* 368 Ill. 425, on page 433, "It is important that attempts of other departments to invade the province of the judiciary be repelled. Likewise, it is essential that the courts decline to assume executive power conferred by the legislature."

Defendants argue that the legislation is equivalent to a "local option" law, which may be desirable in one locality and undesirable in another because of a difference of circumstances between the two localities. Attention is directed to analogous "delegations of authority" for the adoption or rejection of judicial machinery. The Municipal Court Act makes the establishment of municipal courts optional rather than compulsory in cities or villages having a population of not less than 15,000 nor more than 500,000. (Ill. Rev. Stat. 1949, chap. 37, par. 442.) Power to decide whether a municipal court shall be established is granted to the voters of the municipality. (Ill. Rev. Stat. 1949, chap. 37, par. 503.) After a municipal court is organized, the power to prescribe the modes and rules of procedure rests with a majority of the judges of the court. Similarly, cities, villages and incorporated towns, having a population in excess of 30,000 inhabitants may, pursuant to the applicable statute, by means of a popular referendum, elect to establish city, village and town courts. (Ill. Rev. Stat. 1949, chap. 37, par. 333.) The Municipal Court Act and the City Court Act recognize that the need for municipal courts and city courts differs among municipalities. On the other hand, the moral and social problems sought to be remedied by the Domestic Relations Act are, as we observed in *Hunt* v. *County of Cook,* 398 Ill. 412, "largely

the same throughout the State." With respect to the asserted delegation of power, the power to establish a municipal court or city court, as the case may be, is returned to the people from whom all governmental power originates. The judges of the municipal courts and city courts are not granted power to render effective or to suspend a statute in their discretion, unfettered or otherwise.

Defendants also say that there is an analogy between the "delegation" of power in the present statute to the judiciary to appoint masters in chancery and the "delegation" of optional power to probation officers. With respect to the latter, the Criminal Code (Ill. Rev. Stat. 1949, chap. 38, par. 792,) provides, among other things, that the circuit court of each of the several counties may appoint a probation officer to act as such for and throughout the county to which he is appointed. The functions of a probation officer, it is said, are in all material respects strikingly like those of the masters in chancery authorized to be appointed by the legislation assailed in the case at bar. Defendants point out that a probation officer makes an investigation, informal in nature, consisting of inquiries into the habits, background, and social situation of applicants for probation and that, here, a similar study by a master is contemplated. The creation of divorce divisions, at the option of the courts, and the appointment of masters in chancery thereto, are not actually analogous to the appointment of probation officers. Probation officers conduct postjudgment investigations after the guilt of a defendant has been established by competent evidence. The duties of masters in the so-called divorce divisions would be to conduct predecree investigations or, stated more plainly, to conduct investigations of the parties prior to judgment.

The contention is made that section 7 of the statute violates section 1 of article VI of our constitution by usurping the inherent judicial powers of this court to make proper rules of practice and procedure for inferior courts

and, further, by usurping the inherent judicial power of the circuit court of Cook County and of the twenty-eight city courts of the State to make rules for the conduct of their own business, subject, of course, to the rules of this court. Section 1 of article VI of the constitution provides that the judicial powers of the State shall be vested in one Supreme Court, circuit courts, county courts, justices of the peace, police magistrates, and such courts as may be created by law in and for cities and incorporated towns. Section 7 of the Domestic Relations Act empowers all or a majority of the judges of all courts in any judicial circuit exercising jurisdiction in divorce, separate maintenance and annulment of marriage actions to make such rules as, in their judgment, may be necessary and proper for effectuating the objects of the act and for the governance of the Divorce Division. Such rules, section 7 declares, shall be binding upon and govern all courts having jurisdiction of actions for divorce, separate maintenance, and annulment of marriage within the respective judicial circuits. The particular contention of the petitioner is that section 7 is unconstitutional in delegating power to the judges of the circuit and superior courts to make rules which are binding not only upon those courts but also the city courts exercising jurisdiction in the same judicial circuit. Petitioner readily concedes that the Supreme Court has inherent power to prescribe rules for inferior courts and that a court has power to prescribe rules regulating the practice in its own court. The precise point, however, is that one court cannot prescribe a rule binding upon another court which has concurrent jurisdiction. Inferior courts may adopt rules to facilitate procedure and practice before them, but such rules must be reasonable and subject to review by the Supreme Court. (*People* v. *Callopy*, 358 Ill. 11.) Here, the legislature is not attempting to exercise rule-making power but is, instead, delegating whatever rule-making power it may possess. This power is inherently judicial in its nature

and is not power delegated to courts by the legislature. *Prindeville* v. *People,* 42 Ill. 217; *Holloway* v. *Freeman,* 22 Ill. 197; *Owens* v. *Ranstead,* 22 Ill. 161.

The judges of the superior court outnumber the judges of the circuit court of Cook County. The judges of the circuit and superior courts together, of course, outnumber the judges of the city courts of Cook County. The practical effect of section 7 is to grant to the judges of the superior court of Cook County power to make rules not only for the superior court but, also, for the circuit court of Cook County and the various city courts existing within the territorial limits of the county. Each inferior court enjoys, however, the power to make its own rules with respect to the governance of its own practice to the extent those rules do not conflict with rules promulgated by this court. We are of the opinion that the power conferred by section 7 upon the judges of the circuit and superior courts transgresses the inherent rule-making power possessed by city courts of the same judicial circuit.

The further contention is made that sections 2 and 7 of the Domestic Relations Act violate section 29 of article VI of the constitution which provides, "All laws relating to courts shall be general, and of uniform operation; and the organization, jurisdiction, powers, proceedings and practice of all courts, of the same class or grade, so far as regulated by law, and the force and effect of the process, judgments and decrees of such courts, severally, shall be uniform." One premise underlying the enactment of the statute is that some judicial circuits of the State will adopt the act and that others will decline so to do. It follows that, in some judicial circuits, circuit courts would be exercising power in divorce, separate maintenance and annulment actions not being exercised by circuit courts in judicial circuits having no Divorce Division. Undoubtedly, the act destroys uniformity as to the powers, proceedings and practice of courts. Upon adoption of the resolution of

September 19, 1949, the circuit and superior courts within the Cook County judicial circuit were authorized to exercise pervasive powers of investigation and supervision in divorce, separate maintenance and annulment actions not enjoyed by the circuit and city courts in judicial circuits having no Divorce Division. The same observation applies with respect to the practice and proceedings in the three classes of cases specified in the act. Uniformity is lacking not only between the courts of other judicial circuits but the courts having concurrent jurisdiction in divorce, separate maintenance and annulment actions in the same judicial circuit.

In *Klokke* v. *Dodge,* 103 Ill. 125, the constitutional validity of a statute was challenged under the statute providing that, in all counties in which probate courts are or hereafter may be established, county courts shall have concurrent jurisdiction with the circuit court in all cases at law and in equity, except criminal cases where the punishment may be death, or confinement in the penitentiary. The act was clearly in conflict with section 29 of article VI of the constitution for the reason it destroyed uniformity of practice and proceedings between county courts in the various counties of the State, since county courts in some counties were given powers and jurisdiction not granted to county courts in other counties. A marked analogy obtains between the *Klokke case* and the present case. Here, courts in those judicial circuits which adopt the act would be vested with powers not given to circuit courts in any other judicial circuit, namely, to make rules for city courts and to impound court files in all matters involving children.

Petitioner contends that section 12 violates constitutional guaranties by authorizing the master in chancery of a Divorce Division to ascertain the possibility of effecting a reconciliation of the parties, and, where deemed feasible, invite the assistance of representatives of the religious denominations to which the parties litigant belong. The first

amendment to the Federal constitution and section 3 of article II of our constitution are invoked. Violations of due-process guaranties are also charged. Section 12 admits of the construction, as petitioner urges, that a master, in his sole discretion, may invite the representatives of religious denominations to any hearing without the acquiescence of the parties. It may well be that a person seeking a divorce does not desire attempts at reconciliation. Indeed, a party may, for reasons sufficient to himself or herself, oppose such an effort. Section 12 does not require, as a prerequisite, the consent of the parties to an attempt to effect a reconciliation. There is no statutory restraint as to the number of persons who may be called in by the master in his attempt to reconcile the parties. Reconciliation attempts could easily develop into inquisitions. In any event, during the period, which may well be an extended one, the party would be deprived of his right to a hearing upon the complaint for divorce or separate maintenance and would, necessarily, be denied due process of law, within the contemplation of constitutional safeguards.

*Amicus curiae* directs attention to portions of the statute relating to treatment of dependent, neglected and delinquent children (Ill. Rev. Stat. 1949, chap. 23, p. 371,) and the Adoption Act. (Ill. Rev. Stat. 1949, chap. 4, p. 71.) The character of proceedings under these two statutes is essentially different from actions for divorce and annulment of marriage which are adversary proceedings. *Lindsay* v. *Lindsay,* 257 Ill., 328, sustaining the constitutionality of the Dependent Children Act, does not purport to sanction approval of judgments of the juvenile court based solely upon investigative reports. With respect to the Adoption Act, we deem sufficient a reference to the safeguards with which section 1 of article 3 surrounds the rights of the parties to confront and to examine adverse witnesses by providing, "In no event shall any such report be filed with or become a part of the records of the case, nor shall

any facts therein set forth be considered in the hearing of the cause unless established by competent evidence." Ill. Rev. Stat. 1949, chap. 4, par. 3-1.

We are of the opinion that the situation presented in *Illinois ex rel. McCollum* v. *Board of Education,* 333 U.S. 203, is similar. In the *McCollum case,* the board of education of the city of Champaign permitted a private religious group including representatives of the Catholic, Jewish and Protestant faiths to give religious instruction in public school buildings once each week. Students whose parents so requested were excused from their secular classes during the periods of religious instruction and were required to attend the religious classes. Other students not attending the religious instruction classes were required to attend their regular secular studies. This arrangement, the Supreme Court of the United States held, violated the constitutional principle of separation of church and State guaranteed by the first amendment to the Federal constitution and made applicable to the States by the fourteenth amendment. "This," the court said, "is beyond all question a utilization of the tax established and tax supported public school system to aid religious groups to spread their faith." In like manner and to a greater degree than in the *McCollum case,* by permitting a master in chancery to summon the minister, priest, rabbi, or other representative, to a hearing for the purpose of effecting a reconciliation, the statute utilizes a tax-established and tax-supported instrumentality for the administration of justice to aid religious groups to spread their faith. It is a matter of common knowledge that divorce is more abhorrent and reprehensible to some religious faiths than to others. Indeed, some religious groups do not recognize the validity of a divorce decree rendered by a civil court. Petitioner raises the legitimate query as to how representatives of those religious faiths can be expected to respond to an invitation to repair to and aid a civil court when their religion considers the proceedings

a nullity. On the other hand, if they do co-operate, the representatives of those religious faiths may be more successful in effecting reconciliations than the representatives of other groups, but apart from the fact that the Divorce Division might find itself serving as the vehicle for spreading a particular faith, there would be an element of compulsion present which our basic law does not sanction.

Petitioner urges that section 13 violates the due process clauses of the State and Federal constitutions in depriving parties of the right of cross-exmination. Section 13 grants unlimited authority to the master in chancery to cause to be investigated all matters relating to the inquiry before him and to refer any such matter to an appropriate welfare agency for investigation and report. It is pointed out that no rights are accorded the parties to the action to rebut the evidence adduced in the prejudgment investigation into the marital and financial circumstances of litigants either by cross-examining the persons from whom such evidence is taken or by presenting contrary evidence, and that, inevitably, statements will be incorporated into the master's report which the parties will not have been afforded an opportunity to meet. Section 2 of the Evidence Act (Ill. Rev. Stat. 1949, chap. 51, par. 2,) contemplates that the parties to litigation, "when one of them is offered as a witness against the other, shall occupy equal ground; that both shall be present in the flesh, or have the power to be present. If it were not so, the greatest injustice would be the result." (*Boynton* v. *Phelps,* 52 Ill. 210.) The authority granted the master by section 13 is so sweeping in scope as to make him a prosecutor as well as a judicial officer. But little, if any, protection is afforded parties from arbitrary recommendations of a master based upon *ex parte* evidence. This, together with the fact that the parties are not granted the opportunity to cross-examine witnesses who offer testimony out of their presence, is a clear violation of the concept of due process of law.

Defendants place reliance upon *Williams* v. *New York*, 337 U.S. 241. In the *Williams case*, the defendant was convicted of murder in the first degree and the jury recommended a sentence of life imprisonment. In the State of New York, such a recommendation is merely advisory. To aid him in exercising the discretion vested in him intelligently, the trial judge referred investigation of the matter of Williams's sentence to the court's Probation Department to make extrajudicial inquiries relative to his background, health, habits, conduct and mental and moral propensities. The probation report indicated that defendant possessed a "morbid sexuality" and classified him as a "menace to society." Acting upon this report and from information obtained through other sources, the trial judge rejected the jury's recommendation and sentenced defendant to death. Upon review in the United States Supreme Court, the contention was made that the sentence of death was based upon information supplied by witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination or rebuttal. Sustaining the judgment of the Court of Appeals of New York (298 N.Y. 803,) which had affirmed the judgment of the trial court it was held that, in considering the sentence to be imposed after conviction, a trial judge, even where the death penalty is imposed, is not restricted to information received in open court. The *Williams case* does not aid defendants. The court pointed out that a distinction obtains between prejudgment and postjudgment investigations into a defendant's personal life and circumstances. The question presented was not one of a judgment in the first instance being predicated wholly or partially upon information obtained as a result of extrajudicial investigations such as authorized by the statute in the present case.

In *People* v. *Cooper*, 398 Ill. 468, it appeared that, during the course of defendant's trial upon an indictment for murder, the trial judge conducted a private investigation of

certain of her character witnesses, of his own volition, and, before defendant's motion for a new trial was argued, the judge and his bailiff personally investigated the premises where the homicide occurred. These prejudgment investigations were held to constitute a denial to the defendant of due process of law. If a judge is without authority to conduct a prejudgment investigation, it follows necessarily that a master in chancery cannot be vested with the broad authority described in section 13.

Other points raised and argued by the parties have some merit but do not require consideration.

The Domestic Relations Act of 1949 and its companion acts, Senate bills Nos. 308 and 309, are void. Accordingly, the writ of *mandamus* is awarded.

*Writ awarded.*