Docket No. 97059–Agenda 16–May 2004.

In re 
MARRIAGE OF NORMA PEREZ DE BATES, Appellant, and R. EDWARD BATES, Appellee.

Opinion filed October 28, 2004.

JUSTICE KILBRIDE delivered the opinion of the court:

Following a lengthy hearing on the petition of Edward Bates to modify custody, the trial court terminated Norma Bates’ custody of the minor child, awarded custody to Edward, and restricted Norma’s visitation rights pending a professional evaluation. The court also denied Edward’s petition to terminate unallocated maintenance and support based on an alleged continuing conjugal relationship between Norma and another man. Prior to the hearing, the court denied Norma’s constitutional challenge to section 506(a)(3) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/506(a)(3) (West 2002)) and, at trial, read and relied on the written report of the child’s representative appointed pursuant to that statute. Norma appealed, Edward cross-appealed, and the appellate court affirmed. 342 Ill. App. 3d 207. We granted Norma leave to appeal. 177 Ill. 2d R. 315. Edward seeks cross-relief. 155 Ill. 2d R. 318. We now affirm.

BACKGROUND

The parties were granted a judgment of dissolution, incorporating a joint parenting agreement, on July 14, 2000. The agreement provided that the minor child, S.B., would reside primarily with Norma, subject to Edward’s defined rights of visitation. The agreement mandated the “involvement and cooperation of both parents” in S.B.’s best interests, and both parents were ordered to use their “best efforts to foster the respect, love and affection of S.B. toward each parent” and to “cooperate fully in implementing a relationship with S.B. that would give her the maximum feeling of security that may be possible.” The judgment further provided that Edward would pay unallocated family support to Norma until one of several described events, including the death of either party, the remarriage of Norma, or the cohabitation of Norma on a resident, continuing, conjugal basis as determined by a court after notice and a hearing.

On March 9, 2001, Norma filed a petition for modification of visitation and other relief, alleging that Edward had breached the joint parenting agreement and that S.B. was experiencing extreme anxiety and distress following contact with her father. She also requested appointment of a guardian 
ad litem 
pursuant to section 506(a) of the Act (750 ILCS 5/506(a) (West 2000)). In an agreed order, attorney John Bush was appointed as the child’s representative. The record is silent as to why a child representative was appointed, rather than a guardian 
ad litem 
as requested by Norma.

On March 19, 2001, Edward petitioned the court for a rule to show cause why Norma should not be held in contempt for denying him all contact with S.B., including by telephone, beginning around January 1, 2001. Edward’s petition claimed that Norma failed to discuss decisions regarding S.B.’s activities with him; that she unilaterally transferred S.B. to a different school without prior notice to or discussion with Edward; and that she repeatedly denigrated Edward in the presence of S.B. On May 15, 2001, Edward petitioned to modify the judgment for dissolution, including custody, asserting the same grounds as a willful violation of the judgment of dissolution and the joint parenting agreement. Edward also sought termination of the unallocated family support, alleging that Norma had cohabited on a resident, continuing, conjugal basis with another man. The matter was set for trial on all issues on December 19, 2001.

 Pursuant to section 604(b) of the Act (750 ILCS 5/604(b) (West 2000)), the court appointed Dr. Gerald Blechman to evaluate the postjudgment visitation dispute and to make a recommendation for its resolution. After interviewing S.B., Dr. Blechman became concerned about her emotional stability and suggested to the court that she be referred to Dr. Roger Thatcher for therapy. Dr. Thatcher began his involvement as a therapist in September 2001.

On October 1, 2001, Dr. Blechman sent his evaluation to the court and to all attorneys, including the child’s representative. The report recounted diagnostic interviews with S.B. and her parents, a collateral interview with Kristin La Scala (a daughter of Edward), and psychological testing administered to Norma and Edward. Dr. Blechman concluded that Norma had induced alienation of S.B. from her father and that this had taken a significant toll on S.B.’s mental health. He recommended immediate intervention to restore the father-daughter relationship. He suggested family therapy two or three times a week with Edward and S.B., and a strong admonishment to Norma to cooperate with the program, including ceasing any form of abuse allegations against Edward.

At the request of Edward, the court, pursuant to Supreme Court Rule 215 (166 Ill. 2d R. 215), required Norma to submit to a psychological examination by Dr. Robert Shapiro. After conducting three clinical interviews and psychological testing on Norma in October and November 2001, Dr. Shapiro submitted his written report, admitted in evidence at trial. He concluded that most of the psychological testing was invalid because Norma’s answers produced results indicative of an individual who is purposely trying to deceive and present herself as virtuous. He recounted that Norma reported she was afraid of Edward caring for S.B. because he was an alcoholic who was “always drunk.”

Norma also reported that S.B. did not enjoy her visitations with Edward. At the time of his evaluation of Norma, S.B. had not visited her father since January 2001. Norma acknowledged that she called police in Florida on three occasions while S.B. was visiting Edward there during the Christmas holiday in 2000 because she could not reach S.B. and was worried about her safety. Dr. Shapiro concluded that the presence of police during this vacation disrupted the quality of the vacation and served to remind S.B. of her mother’s omnipotence. He could not confirm the existence of parent alienation because he had not evaluated the child, the child-father relationship, and the child-mother relationship.

At the request of Norma, the court appointed Dr. Patrick J. Kennelly, a licensed clinical psychologist with a practice in the treatment of alcoholism, to conduct an examination of Edward pursuant to Supreme Court Rule 215 (166 Ill. 2d R. 215). He conducted three interviews with Edward in October 2001 and administered psychological testing and alcoholism screening tests. He furnished a written report, concluding that Edward had no evidence of psychological disorders and that the testing showed no indication of alcoholism.

The child’s representative proceeded with an investigation and filed a written report with the court on November 19, 2001. The parties also conducted extensive discovery.

On January 11, 2002, the court ordered Dr. Blechman to conduct a reevaluation concerning whether the recommended steps were successful in improving S.B.’s relationship with her father. He filed an updated evaluation on January 24, 2002, concluding that Norma was still manipulating S.B. and recommending that sole custody of S.B. be given to Edward, with supervision of Norma’s visitation by a professional familiar with parental alienation syndrome. He also recommended continued psychotherapy for S.B. and her father for the foreseeable future and strongly recommended that Norma seek psychotherapy.

Pretrial Motions

On December 14, 2001, Norma filed a number of motions. She moved to dismiss Edward’s petition to modify custody pursuant to section 2–615 of the Code of Civil Procedure (Code) (735 ILCS 5/2–615 (West 2000)), alleging the failure of Edward to present affidavits establishing a reason to believe S.B.’s physical, mental, moral or emotional health was seriously endangered by the present environment, as required by section 610 of the Act (750 ILCS 5/610 (West 2000)).

Norma next filed a motion to bar the testimony of Dr. Richard Gardner, Edward’s disclosed expert witness, on the ground that the subject matter of his testimony, parental alienation syndrome (PAS), did not meet the reliability requirements set out in 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923).

Norma then filed a “motion to order child representative to testify or in the alternative to strike his recommendations and for declaratory judgment regarding the constitutionality of 750 ILCS 5/506.” The motion claimed that Norma’s right to due process of law would be denied if the child’s representative were allowed to present his report with no attendant right to cross-examine him. The motion asked the court either to strike and disregard the recommendations of Mr. Bush, or to order him to submit to deposition and to testify in the case, or to declare the statute unconstitutional “on its face and/or as applied to Norma Perez.”

Finally, Norma filed a motion pursuant to section 2–619(a)(9) of the Code (735 ILCS 5/2–619(a)(9) (West 2000)) to dismiss Edward’s petition to modify custody on the ground that Edward had improperly asserted the physician-patient privilege when his physical and mental health were at issue.

Edward filed written responses to those motions, asserting, 
inter alia
, that Norma had filed dispositive motions less than 63 days before trial, in violation of a local rule. The motions were called for hearing on the first day of trial and decided the following day.

On December 20, 2001, the court denied Norma’s section 2–615 motion, finding that Edward’s verification of the pleading was sufficient and noting that Norma had participated in extensive discovery without objection. On January 15, 2002, the court allowed Edward to file an affidavit in support of his petition to modify custody, noting that it asserted no changes in the facts alleged in the petition. Norma’s section 2–619(a)(9) motion was stricken because of its late filing, without prejudice to her right to raise the assertion of privilege issue at trial.

The court struck Norma’s motion to bar the testimony of Dr. Gardner as untimely. However, the court treated it as a motion 
in limine 
and also ordered a 
Frye 
hearing, to commence on January 15, 2002.

The court found that the child representative’s report was “in the nature of a prejudgment or a pretrial pleading” and “not evidence,” but the court sealed the report. The court reasoned that the pretrial submission of the report did not implicate the challenged provisions of section 506 of the Act, and the court accordingly denied Norma’s request to declare the statute unconstitutional.

On December 18, 2001, Edward filed an amended motion to bar witnesses, including Dr. Jeffrey Johnson, a physician designated as an expert by Norma, because of late disclosure and failure to comply with the requirements of Supreme Court Rules 213(f) and (g) (177 Ill. 2d Rs. 213(f), (g)). The court entered an order barring Dr. Johnson from testifying because his report had not been identified and filed in a timely fashion. The court also denied Norma’s motion 
in
 
limine 
to bar Edward from testifying at trial because of his assertion of physician-patient privilege, observing that she failed to file a motion to compel answers to the deposition questions.

The 
Frye 
Hearing

Edward, as proponent of the PAS testimony, proffered three expert witnesses and 136 articles from peer-reviewed publications as exhibits. Norma proffered no witnesses and no exhibits.

Dr. R. Christopher Barden, an attorney and a psychologist licensed in Minnesota and Texas, testified that he is familiar with PAS and that he believed everyone in the social sciences field is familiar with the term. He characterized PAS as a useful and clear description of a set of symptoms or clusters, commonly seen in child custody proceedings, when one parent is actively involved in turning a child against the other parent.

Dr. Barden testified that PAS is generally accepted in the relevant scientific community. He based his opinion on his clinical experience and on his extensive perusal of peer-review publications referencing the syndrome. Peer-review publications are journals and other compendiums where research articles are reviewed for accuracy and methodology by a panel of experts in the relevant field. Dr. Barden identified several peer-reviewed articles submitted by Dr. Richard Gardner and other authors describing and authenticating PAS. Copies of these articles were admitted in evidence. In Dr. Barden’s opinion, the concept of PAS is not novel, having been first referenced in 1994 by the American Psychological Association. Although PAS is not described in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM–IV), published by the American Psychiatric Association in 1994, Dr. Barden did not believe that fact indicated rejection of the syndrome, noting that another revision of the DSM is expected by 2010.

Dr. Richard Gardner, a board-certified psychiatrist and a clinical professor of child psychiatry, also testified. He referenced several books on PAS and an index of 59 articles on PAS written by his peers. He has written 13 published articles on PAS. He described PAS as a disorder arising primarily, if not exclusively, in the context of child custody disputes. It results from the combination of one parent’s programming or brainwashing a child into a campaign of denigration against the other parent, and the undue indoctrination of the child by the programing parent with his or her own inflated “contributions.” This combination, in his opinion, results in PAS. Dr. Gardner testified that PAS is generally accepted in the relevant psychiatric and psychological communities.

Dr. Robert B. Shapiro, a clinical psychologist licensed in Illinois and a member of the Board of Evaluators, used by the Du Page County circuit court to evaluate families in custody disputes, also testified that PAS was generally accepted by the relevant psychological community, observing that “I don’t know anybody who doesn’t accept it.” Dr. Shapiro himself has diagnosed PAS many times and has testified often in court on the subject.

At the conclusion of the hearing, the court found “that the principle of Parental Alienation Syndrome is sufficiently established to have gained general acceptance in the particular field.”

The Trial

Numerous witnesses testified, either in person or by evidence deposition, at the trial beginning on February 26, 2002, and continuing intermittently until its conclusion on April 17, 2002. Among the witnesses were court-appointed evaluators, retained experts, treating practitioners, as well as the parties, family members, police officers, and private investigators.

Dr. Roger Hatcher, S. B.’s court-appointed therapist, was called as a witness by Edward. He is a licensed psychologist and is the practice director at PsychCare Associates in Aurora. He found S.B.’s mental health to be severely compromised. She was acutely and severely distressed with major symptoms of anxiety and panic relating to Edward caused by Norma’s influencing the child against her father. He found no evidence that any of her distress was caused by Edward. If not for therapeutic intervention, she was headed for an increasingly severe psychiatric crisis. After a series of sessions with S.B. and interviews with both parents, Dr. Hatcher set up a visitation schedule. After the visits, S.B.’s condition improved and her relationship with Edward was better.

Dr. Shapiro, who conducted the Rule 215 evaluation of Norma, identified three occurrences consistent with alienation: (1) Norma’s series of phone calls to Florida during S.B.’s visitation with Edward; (2) Norma’s registering S.B. in school under the surname “Perez,” and (3) Norma’s failure to maintain S.B.’s scheduled visitation with her father.

Dr. Kennelly, who conducted the Rule 215 examination of Edward, concluded that Edward showed no evidence of major psychological disorders. He testified that Edward’s test results for alcoholism were insignificant.

Dr. Blechman, the court’s section 604(b) evaluator, testified that S.B. fit the typical criteria for PAS. Her complaints about her father did not appear to be valid. Although she would obsessively repeat the same accusations against her father, she could provide no explanation when pressed for particulars. In Dr. Blechman’s opinion, S.B. had false memories suggested or created by Norma. Although S.B. told him that her father struck her during the Florida vacation, he chose not to believe her. Based on his interviews with the parties, his observations, and his conversations with Dr. Hatcher, he opined that residential custody of S.B. should be awarded to Edward, subject to supervised visitation by Norma with a professional present.

Dr. Richard Gardner testified regarding PAS and the alleged alcoholism of Edward. He did not conduct clinical interviews with S.B. or Norma, but rendered hypothetical opinions based on his review of documents, reports, depositions and information conveyed to him by Edward. Among the materials reviewed were Dr. Blechman’s reports and notes, letters from Dr. Hatcher, police reports from Florida, and the report of child representative John Bush.

Dr. Gardner defined PAS as a psychiatric disorder arising in the context of a child custody dispute. In this disorder, one parent “programs” or “brainwashes” a child into a campaign of denigration against the other parent, even though that other parent is generally good and loving. The denigrating custodial parent inflates his or her own contributions, and PAS arises as a result of a combination of both the undue denigration and the inflated heightening of the custodial parent’s contributions. In Dr. Gardner’s opinion, S.B. exhibited classic signs and symptoms of PAS in the moderate category. He concluded that therapy for the child would be useless as long as she lived with her mother. Dr. Gardner also concluded that Edward is not an alcoholic and that his possible consumption of some alcohol did not interfere with his parenting.

Edward testified that S.B. had been taken out of her previous school without his knowledge, and he was required to go to court in September 2000 to learn her new school, home address, and phone number. Edward also testified concerning the Florida visitation incident. He described the trip he took with S.B. to Florida in December of 2000 as apparently a happy and good one for her. He observed that on December 29, while S.B. was speaking with her mother on the telephone, she appeared to become agitated. A sheriff’s deputy soon arrived, spoke with S.B., and also spoke with Norma on the telephone. No official action was taken. At approximately 1 a.m. the following morning, the same deputy arrived and said he had been called by Norma. He conferred with Edward, who showed him to S.B.’s room, where she was sleeping. The deputy again left, without taking any action. At 12:15 p.m. another deputy arrived, spoke with Edward and S.B., and left without taking any action.

Edward’s account of these events was essentially corroborated by Richard Young, the deputy who first arrived. His testimony was in the form of an evidence deposition taken telephonically at the instance of Mr. Bush, the child representative. The deposition was taken during trial, with leave of court, and over Norma’s objection. Counsel for all parties participated in the deposition. Norma objected to the testimony because Deputy Young was not disclosed as a witness as required by the court’s pretrial order. The objection was overruled, and Deputy Young’s deposition was read into evidence. He testified that he was dispatched as a result of a Teletype message from Illinois, requesting a check on the child’s welfare. He could discern no physical injury or abuse to S.B., and she made no claim that Edward had harmed her, although she seemed upset when he arrived. He returned later that night in response to another Teletype message from Illinois, requesting another welfare check and asking for S.B. to call her mother. Since the child was sleeping, Edward told him he would have her call her mother in the morning.

Edward related that after January 1, 2001, S.B. ceased being animated and vocal with him, instead becoming withdrawn and difficult to engage in conversation. On numerous occasions he telephoned Norma’s residence seeking to speak with S.B., but his calls went unanswered or unreturned.

Norma claimed Edward was drinking and abusing S.B. during the Florida trip, thus occasioning her telephoning the police. She admitted, however, that police found no evidence of either intoxication or abuse. Norma claimed that she always let S.B. speak with Edward when he telephoned or left a message for S.B. Her telephone records revealed, however, no return calls to Edward’s home or cell phone numbers. Further, although she claimed that visitation between Edward and S.B. did not occur in 2001 only because of Edward’s preference, several letters were introduced demonstrating that Edward continuously requested his scheduled visitation during that time.

Several witnesses, including family members and private investigators, testified as to the frequency and amount of Edward’s alcohol consumption. Edward admitted drinking wine frequently and rum and coke occasionally, but denied being intoxicated or drinking in S.B.’s presence. He said that his last alcohol consumption was about mid-February 2002, and that he had quit drinking because it had become an issue.

The court declined to conduct an 
in camera
 interview with S.B. on the issue of whether she was abused by Edward in Florida because there was a meaningful risk of putting the 10-year-old child in a position of blaming herself for the outcome of the case. The court noted that “I can’t possibly put that child through it. I’m not going to have her come into this courtroom.”

Norma admitted knowing Parmod Malik, an airline pilot, for 15 to16 years, and said they planned on getting married some day. She moved into a home in St. Charles owned by Malik, and admitted that Malik stayed overnight there with her on occasion since January 2001, and that they had sexual relations on two of his visits. Nonetheless, they maintained separate residences and have not vacationed together. Neither Norma nor Malik keeps personal belongings in the home of the other. Each is responsible for his or her own expenses and home maintenance, and they do not commingle any funds. Although Norma admitted writing checks to Malik, she claimed they were rental payments on the St. Charles home. A private investigator employed by Edward testified that he observed Malik and Norma kissing and hugging on several occasions. He also saw Malik enter Norma’s home several times, but did not see him leave.

At the close of the hearing, child representative Bush offered his sealed report in evidence. The court allowed its admission over Norma’s objection that it contained hearsay and that she had been denied the right to cross-examine Bush.

Bush’s report described his interviews with S.B., Edward, and Norma, and various school and medical records provided by the parties, as well as his observations of visitations between S.B. and Edward. S.B. related to Bush that she enjoyed the Florida trip and denied that any abuse occurred. S.B. said she did not want to visit Edward because he gets drunk and she feared he would hurt her. She described recollections of Edward coming home drunk and “poking her in the eyes and stepping on her toes” when she was smaller. She admitted she has never seen him drink alcohol and could not articulate any reason for her fears. Additionally, Bush attached the first written report of Dr. Blechman and the written report of Dr. Mark Goldstein, a psychologist who had completed a court-ordered child custody evaluation prior to the judgment of dissolution. The report concluded with Bush’s recommendation that physical custody of S.B. be transferred to Edward.

The trial court found that Edward had proved, by clear and convincing evidence, that S.B.’s present environment seriously endangered her physical, mental, moral or emotional health, and that it was in S.B.’s best interests that Edward be awarded sole custody immediately. The court abated visitation between S.B. and Norma until further order of court, finding S.B. would be seriously endangered by visitation. The court directed Edward and S.B. to continue therapy with Dr. Hatcher and directed Edward not to consume alcohol until further order of the court. The court denied Edward’s petition to terminate unallocated support and discharged the rule to show cause against Norma. The court found no just cause to delay enforcement or appeal, pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)).

In announcing the ruling, the trial court said that it was based on its review of the pleadings and orders in the file, the exhibits, the substance and credibility of the expert testimony, the substance and credibility of the parties’ testimony, and the testimony of nonparty witnesses, as well as its review of the child representative’s report. The court said it would “throw out the words ‘parental alienation syndrome,’ ” basing its findings instead on the standard set out in section 602(a)(8) of the Act (750 ILCS 5/602(a)(8) (West 2002)), namely, “The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the parents and child.” Norma appealed and Edward cross-appealed.

The appellate court, in an opinion published in part (166 Ill. 2d R. 23), affirmed both the change of custody and the denial of Edward’s petition to terminate unallocated support. 342 Ill. App. 3d at 215. We allowed Norma’s petition for leave to appeal. 177 Ill. 2d R. 315. Edward seeks cross-relief on the termination of support issue. 155 Ill. 2d R. 318. We also granted leave to Justice For Children, a national child advocacy organization, and to Richard L. Ducote, a member of the Louisiana bar, to file 
amicus curiae 
briefs in support of Norma. 155 Ill. 2d R. 345.

ANALYSIS

In her petition for leave to appeal, Norma raised four points relied on for reversal. Those points, as described in her petition, were: (1) the trial court committed reversible error in ruling that section 506 of the Act (750 ILCS 5/506 (West 2002)) was constitutional and in admitting and considering the child representative’s report, and in modifying custody; (2) the trial court should not have permitted the child representative’s undisclosed witness (Deputy Young) to testify; (3) the trial court committed reversible error in failing to interview the minor child; and (4) the trial court committed reversible error in failing to bar the parental alienation syndrome testimony of Dr. Gardner. In her brief, Norma asserts additional grounds for reversal: (1) the trial court’s rulings on the section 2–615 and 2–619 motions, (2) the order barring Dr. Johnson from testifying, and (3) the limitation of the scope of another witness’ testimony.

Supreme Court Rule 315(b) provides that a party’s petition for leave to appeal “shall contain *** (3) a statement of the points relied upon for reversal of the judgment of the Appellate Court.” 177 Ill. 2d R. 315(b)(3). Failure to raise an issue in the petition for leave to appeal may be deemed a waiver of that argument. 
Federal Deposit Insurance Corp. v. O’Malley
, 163 Ill. 2d 130, 154 (1994). Adherence to Rule 315(b)(3) is not a jurisdictional prerequisite to our review of an issue; it is a principle of administrative convenience. 
Dineen v. City of Chicago
, 125 Ill. 2d 248, 265 (1988). In this case, however, we will consider only the points raised in the petition for leave to appeal. The additional points urged as grounds for reversal in Norma’s brief were thoroughly and thoughtfully discussed in the unpublished portions of the appellate court’s opinion, and we find no sufficient justification to overlook the administrative requirements of Rule 315 in this instance. We therefore deem those arguments to be waived. 
Hansen v. Baxter Healthcare Corp.
, 198 Ill. 2d 420, 429 (2002). We turn now to the issues properly preserved for review.

Section 506 and Procedural Due Process

Norma argues that section 506 of the Act is unconstitutional as applied in her case because she was denied the opportunity to cross-examine the child representative, who functioned as both an advocate and a fact finder and whose written report was relied on by the trial court in its findings. The standard of review of the constitutionality of a statute is 
de novo. People v. Masterson
, 207 Ill. 2d 305, 318 (2003). Statutes are presumed constitutional, and the party challenging the validity of a statute has the burden of clearly establishing that it is unconstitutional. 
In re Curtis B.
, 203 Ill. 2d 53, 58 (2002). The strong presumption of constitutionality requires courts to construe statutes in order to uphold their constitutionality whenever reasonably possible. 
Hill v. Cowan
, 202 Ill. 2d 151, 157 (2002).

Section 506 provides, in pertinent part:

“(a) Duties. In any proceedings involving the support, custody, visitation, education, parentage, property interest, or general welfare of a minor or dependent child, the court may, on its own motion or that of any party, and subject to the terms or specifications the court determines, appoint an attorney to serve in one of the following capacities:

* * *

(3) as a child’s representative whose duty shall be to advocate what the representative finds to be in the best interests of the child after reviewing the facts and circumstances of the case. The child’s representative shall have the same power and authority to take part in the conduct of the litigation as does an attorney for a party and shall possess all the powers of investigation and recommendation as does a guardian ad litem. The child’s representative shall consider, but not be bound by, the expressed wishes of the child. *** The child’s representative shall not disclose confidential communications made by the child, except as required by law or by the Rules of Professional Conduct. The child’s representative shall not be called as a witness regarding the issues set forth in this subsection.” 750 ILCS 5/506(a)(3) (West 2002).

In his written report, child representative Bush described his observations of visitation between Edward and S.B., recounted S.B.’s version of the events in Florida as well as her recollections of Edward coming home drunk and “poking her in the eyes and stepping on her toes” when she was smaller. The report was admitted in evidence, but Norma was unable to cross-examine Bush on his observations and the basis for his recommendations because of the clear statutory prohibition against calling him as a witness. Thus, Norma argues that she was deprived of a meaningful opportunity to be heard on a matter implicating a fundamental liberty interest, thereby violating her right to procedural due process of law as guaranteed by the fourteenth amendment to the United States Constitution (U.S. Const., amend. XIV) and section 2 of article I of the 1970 Illinois Constitution (Ill. Const. 1970, art. I, §2).

The appellate court construed the statute to allow calling the child’s representative as a witness if the representative directly witnesses relevant facts and circumstances used to support a recommendation, because the representative has then “stepped out of his attorney role.” 342 Ill. App. 3d at 214. In that instance, the court reasoned, the representative has become a witness who may be called and questioned at trial, as any other witness, under the terms or specifications as determined by the court. The appellate court held that section 506(a) does not deny a party procedural due process and is not unconstitutional because it can be interpreted to allow a party to request disclosure by the child representative of underlying factual matters or to cross-examine the child representative when the representative acts as a witness. 342 Ill. App. 3d at 214. The court further held that this interpretation may be reconciled with Rule 3.7 of the Illinois Rules of Professional Conduct (134 Ill. 2d R. 3.7), prohibiting an attorney from being both a witness and an advocate for his client, because in such circumstances the court is authorized, under section 506(a)(3), to appoint another attorney to represent the child. 342 Ill. App. 3d at 214.

The appellate court held that the trial court erred in denying Norma’s request to examine Bush, to the extent that the representative’s recommendation was based on his observations as a witness. The court reasoned, however, that the error was harmless because it did not play a significant role in the trial court’s ruling. The trial court recited that it would consider the report “for what it’s worth” along with many other factors and, therefore, any error in considering the report was not prejudicial. 342 Ill. App. 3d at 214-15.

Norma argues before us that the appellate court’s statutory construction is unreasonable because it disregards the express, unambiguous language prohibiting calling the child’s representative as a witness “regarding the issues set forth” in section 506(a)(3). Edward argues that the statute limits those issues to the expressed wishes of the child, confidential communications made by the child, and the training and experience of the child representative. According to Edward, there is no express prohibition on questioning the representative on the factual basis for his recommendations or on his observations in coming to a particular recommendation.

The challenged statute provides that the child representative’s duty shall be “to advocate what the representative finds to be in the best interests of the child after reviewing the facts and circumstances of the case,” and further provides that the representative “shall possess all the powers of investigation and recommendation as does a guardian ad litem.” 750 ILCS 5/506(a)(3) (West 2002).

We agree with Norma that the statutory language is clear and unambiguous. The “issues set forth” in section 506(a)(3) clearly include the duty to advocate what the representative finds to be in the child’s best interests and the power to investigate and recommend in the manner of a guardian 
ad litem
. Where the language of a statute is clear and unambiguous, a court must give effect to the plain and ordinary meaning of the language without resort to other tools of statutory construction. 
Raintree Homes, Inc. v. Village of Long Grove
, 209 Ill. 2d 248, 255 (2004). The representative’s observations and conversations with the parties, witnesses, and S.B. were clearly within the statutory ambit barring him as a witness. Thus, the appellate court’s statutory construction was error, and we must address the issue of whether procedural due process requires allowing the representative to be called as a witness.

In 
Mathews v. Eldridge
, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976), the Supreme Court held that “identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.” 
Mathews
, 424 U.S. at 335, 47 L. Ed. 2d at 33, 96 S. Ct. at 903.

The private interest involved here is the right of parents to the companionship, care, custody, and management of their children. In 
Lassiter v. Department of Social Services
, 452 U.S. 18, 27, 68 L. Ed. 2d 640, 649-50, 101 S. Ct. 2153, 2159-60 (1981), the Supreme Court held that right to be an important interest, warranting deference and protection, absent a powerful countervailing interest. We have also recently held that one of the fundamental rights protected under the fourteenth amendment is the right of parents to make decisions concerning the care, custody, and control of their children without unwarranted state intrusion. See 
Wickham v. Byrne
, 199 Ill. 2d 309, 316 (2002). Further, in 
In re Andrea F.
, 208 Ill. 2d 148, 165 (2003), a case involving termination of parental rights, this court held that parents have a fundamental due process right to the care, custody and control of their children.

In Norma’s case, her right to the companionship, care, custody, and management of S.B. was seriously impacted. Custody of the child was taken from her and, for a period of time, she was denied any visitation. These changes seriously and unfavorably altered Norma’s previous unfettered exercise of her custodial rights. We hold, therefore, that a fundamental liberty interest is implicated in this case.

Next, we must consider whether the statutory prohibition against calling the child’s representative as a witness created a risk of erroneous deprivation of Norma’s custodial rights. The representative’s findings, conclusions, and recommendations were all adverse to Norma’s interests. Without the important tool of cross-examination, Norma’s means of challenging his observations, conclusions, and recommendations were impaired. We have held that the opportunity to cross-examine witnesses and to inspect the evidence offered against a party are part of guaranteeing the exercise of due process before an administrative tribunal. 
Balmoral Racing Club, Inc. v. Illinois Racing Board
, 151 Ill. 2d 367, 408 (1992). This is no less so in a custody hearing in a trial court. A child’s representative is empowered by section 506(a)(3) to make a recommendation after reviewing the facts and circumstances of the case and to conduct his own investigation. The representative, like any other witness, is not immune from error in observation and from inadvertent bias. The proper weight to be given the report of a child’s representative may be influenced by many factors, including his training and experience, the contacts between the representative, the parties, and the child, and the existence of any bias or tendency to favor one gender of parent over the other. Cross-examination is likely to affect the trial court’s assessment of the worth of the representative’s recommendations in many cases.

In 
People ex rel. Bernat v. Bicek
, 405 Ill. 510, 526 (1950), this court upheld a constitutional challenge to the enforcement of the Domestic Relations Act of 1949 (Ill. Rev. Stat. 1949, ch. 37, pars. 105.19 through 105.36). A section of that statute granted unlimited authority to a master in chancery to investigate all matters relating to an inquiry, but provided no means to rebut any evidence adduced in the investigation, either by cross-examination or presentation of contrary evidence. Noting that little, if any, protection was afforded parties from arbitrary recommendations based on 
ex parte 
evidence from witnesses without cross-examination, we held this to be a clear violation of due process of law. 
Bernat
, 405 Ill. at 526.

The statute in the case before us suffers from the same infirmities as the statute in 
Bernat.
 A custodial parent challenging an adverse recommendation is deprived of perhaps the most effective means of doing so because the statute expressly prohibits the right to cross-examine the child representative. Clearly, this created a serious risk of erroneous deprivation of Norma’s custodial rights. Thus, the second factor in the 
Mathews
 analysis is satisfied.

Allowing cross-examination would impose no fiscal or administrative burdens on the state, and it is not inimical to any government interest we can perceive. The third 
Mathews 
factor is, therefore, also satisfied.

 The representative’s report was received in evidence, read, and relied on by the trial court and, thus, Norma’s right to procedural due process was denied. We therefore hold that section 506(a)(3) is unconstitutional as applied in this case.

Even though the application of the statute unconstitutionally deprived Norma of her due process right to cross-examine child representative Bush, that holding is not dispositive, for even errors of a constitutional dimension may be harmless. See 
People v. Lofton
, 194 Ill. 2d 40, 61 (2000). We still must determine whether the deprivation of her right to cross-examine Bush requires reversal of the trial court’s modification of custody.

Modification of Custody

Section 610 of the Act allows modification of a prior custody judgment, absent consent, only if the court finds, by clear and convincing evidence, upon facts that have arisen since or were unknown at the time of prior judgment, that modification is necessary to serve the best interests of the child. 750 ILCS 5/610 (West 2002). The trial court found that S.B.’s present environment seriously endangered her physical, mental, moral or emotional health and that a substantial change in circumstances had been proved by clear and convincing evidence. The court expressly considered the standards for determining best interests set out in section 602 of the Act, including “(8) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child.” 750 ILCS 5/602(8) (West 2002). The court based its conclusion that a change in custody was warranted on a review of all the testimony and evidence, including the representative’s report and its assessment of witness credibility.

The standard of review of custody modification judgments is the manifest weight of the evidence. 
In re Marriage of Cotton 
103 Ill. 2d 346, 356 (1984). The trial court is in the best position to review the evidence and to weigh the credibility of the witnesses. 
Cotton
, 103 Ill. 2d at 356. In determining whether a judgment is contrary to the manifest weight of the evidence, the reviewing court views the evidence in the light most favorable to the appellee. 
In re Marriage of Divelbiss
, 308 Ill. App. 3d 198, 206 (1999). Where the evidence permits multiple reasonable inferences, the reviewing court will accept those inferences that support the court’s order. 
Nemeth v. Banhalmi
, 125 Ill. App. 3d 938, 963 (1984). A custody determination, in particular, is afforded “great deference” because “ the trial court is in a superior position to judge the credibility of the witnesses and determine the best interests of the child.” 
In re Marriage of Gustavson
, 247 Ill. App. 3d 797, 801 (1993).

All of the expert testimony supports the conclusion that Norma had consistently failed to facilitate and encourage a close and continuing relationship between S.B. and Edward. Dr. Blechman, the court-appointed clinical psychologist, testified that Norma had engaged in a systematic pattern of undermining Edward with S.B. and that only a change of custody to Edward was in the child’s best interests. Dr. Shapiro, the psychologist who evaluated Norma at the court’s request, found that Norma was openly distrustful and untruthful in standardized testing and that she did not encourage a close relationship between S.B. and Edward. Dr. Hatcher, the court-appointed therapist, described acute emotional distress in S.B. caused by the mother’s activities, requiring a change in custody. He found no evidence that Edward had neglected or harmed the child in any way, physically, emotionally, or psychologically. Dr. Gardner, Edward’s retained expert, testified that Norma had alienated S.B. from her father and that a change of custody was warranted.

Although evidence of Edward’s drinking, including his own admissions, was admitted, Dr. Kennelly, who evaluated Edward pursuant to Norma’s Rule 215 request, could find no evidence that Edward was alcoholic or psychologically impaired in any way. The court, in its judgment modification, nevertheless directed Edward to abstain from the use of alcohol until further order.

The court announced that it found Norma’s testimony to be inventive, untruthful, manipulative, and self-serving. It found that she did not recognize or take responsibility for her actions and the resultant damage done to the child and the child’s relationship with her father.

Despite the clear manifest weight of the expert testimony and the credibility assessments properly made by the trial court, Norma asserts that the admission of the representative’s report tainted the entire proceedings. She points to no statements in the report, however, that are inconsistent with the evidence at trial. Our review of the report confirms that it is merely cumulative of the testimonial and documentary evidence. Norma makes no argument before us on the effect the denial of her right to cross-examine Bush had on the outcome of the trial. She complains that the report is “riddled with hearsay,” yet she does not identify the purported hearsay statements and she does not describe any prejudicial effect resulting from the report’s admission. A reviewing court is entitled to have issues clearly defined with relevant authority cited. See 
Sterling Finance Management, L.P. v. UBS PaineWebber, Inc.
, 336 Ill. App. 3d 442, 449 n.3 (2002). Further, Supreme Court Rule 341(e)(7) requires that argument “shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on.” 188 Ill. 2d R. 341(e)(7). Here, Norma fails to give this court an adequate basis to grant her relief on this issue.

The written report was completed and furnished to the parties in November 2001, three months before trial. Although Norma could not cross-examine Bush, she was apprised of the persons interviewed, the observations made, and the reports relied on as the basis for his recommendation. She presented no evidence at trial to rebut Bush’s findings, focusing instead on evidence of Edward’s drinking.

The appellate court found that the representative’s report did not play a significant role in the trial court’s ruling and, therefore, did not affect the outcome of the trial. 342 Ill. App. 3d at 214. Our review of the report confirms that none of Bush’s observations, conclusions, and recommendations were inconsistent with the evidence at trial. Norma has not demonstrated that consideration of the report by the court was prejudicial, or even that it affected the outcome. Accordingly, we cannot say that its admission tainted the proceedings. We hold, therefore, that the denial of due process in failing to allow cross-examination of child representative Bush was harmless error and that the judgment changing custody is not against the manifest weight of the evidence.

Dr. Gardner’s Parental Alienation Syndrome Testimony

Norma argues that Dr. Gardner’s testimony did not satisfy the reliability requirements of 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923) and, thus, should have been barred. In 
Frye
, the court observed:

“Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.” 
Frye
, 293 F. at 1014.

The “general acceptance” standard has been adopted by this court. 
People v. Eyler
, 133 Ill. 2d 173, 211 (1989). We have recently reaffirmed the applicability of that standard in 
Donaldson v. Central Illinois Public Service Co.
, 199 Ill. 2d 63, 77 (2002). The trial court will apply the 
Frye 
test only if the scientific principle, technique, or test offered by the expert to support his or her conclusion is “new” or “novel.” 
People v. Basler
, 193 Ill. 2d 545, 550-51 (2000). The trial court in this case made no specific finding on the issue of whether parental alienation syndrome is a new or novel principle. No Illinois reviewing court has considered the question of the general acceptance of PAS.

Evidence at the 
Frye
 hearing established that the syndrome had been described in peer-reviewed literature dating from the late 1980s. Dr. Barden, the psychologist proffered as an expert on the issue of general acceptance in the field, testified that the term “parental alienation syndrome” is not a novel principle, being first referenced by the American Psychological Association in 1994. He testified that PAS is a recognized condition and generally accepted in the field of psychology. Whether PAS remains a new or novel concept several years after it was first described in the literature, the only evidence the trial court heard was that it is generally accepted in the field of psychology. Norma presented no evidence to the contrary.

Despite Norma’s failure to present any evidence in opposition to the PAS theory, Norma and her 
amici 
argue that PAS is “junk science” and cite cases from other jurisdictions rejecting its admissibility. See, 
e.g
., 
Wiederholt v. Fischer
, 169 Wis. 2d 524, 485 N.W.2d 442 (App. 1992); 
Hanson v. Spolnik
, 685 N.E.2d 71, 84 (Ind. App. 1997) (Chezem, J., concurring);
 People v. Loomis
, 172 Misc. 2d 265, 658 N.Y.S.2d 787 (1997). In 
People v. Fortin
, 184 Misc. 2d 10, 14, 706 N.Y.S.2d 611, 613 (2000), PAS testimony was proffered by the defendant in a rape prosecution. The trial court conducted a 
Frye 
hearing, noting that there was no existing authority in New York for the admission of PAS testimony and also noting a split in authority from other jurisdictions. 
Fortin
, 184 Misc. 2d at 13-14, 706 N.Y.S.2d at 613-14. The defendant presented general acceptance testimony from Dr. Richard Gardner, described as the “leading expert in the field.” 
Fortin
, 184 Misc. 2d at 14, 706 N.Y.S.2d at 614. The court noted that Dr. Gardner testified on cross-examination:

“Although the concept of scientific proof may be of importance in such fields as chemistry, physics and biology, the concept is not as applicable in the field of psychology; especially with regard to issues being dealt with in such areas as child custody disputes, and sex abuse accusations.”
Fortin
, 184 Misc. 2d at 12, 706 N.Y.S.2d at 613.

In 
Fortin
, Dr. Gardner was the only witness who testified in support of the general acceptance of PAS. The court held that the defendant had not established that PAS had gained general acceptance in the professional community
. Fortin
, 184 Misc. 2d at 15, 706 N.Y.S.2d at 614.

Dr. Gardner and PAS have been harshly criticized by scholarly writers. See, 
e.g.
, C. Wood, 
The Parental Alienation Syndrome: A Dangerous Aura of Reliability
, 27 Loy. L.A. L. Rev. 1367 (June 1994); C. Bruch, 
Parental Alienation Syndrome & Parental Alienation: Getting it Wrong in Child Custody Cases
, 35 Fam. L.Q. 527 (2001)
. 
Critics have pointed to many flaws in the theory and have challenged Dr. Gardner’s expertise and motivation. While we acknowledge Norma’s arguments on appeal, we note that no PAS critics testified at the 
Frye 
hearing in this case, nor was any other testimony presented in opposition to the general acceptance of PAS.

We observe, however, that the evidence amply supported the trial court’s conclusion that S.B. did not enjoy “a close and continuing relationship” with her father under section 602 (750 ILCS 5/602 (West 2002)). Moreover, the evidence showed that, as a result of the damaged relationship with her father, S.B. suffered emotional distress requiring therapy. In its ruling, the trial court announced that it would “throw out the words ‘parental alienation syndrome.’ ” In expressly disclaiming any reliance on the PAS theory, the trial court instead specifically applied the section 602 standard of the Act (750 ILCS 5/602 (West 2002)), finding that Norma interfered with S.B.’s ability to build a “close and continuing relationship” with her father. 

Accordingly, even though the trial court, in its pretrial ruling, found PAS generally accepted in the relevant scientific community, the record clearly demonstrates that Dr. Gardner’s PAS testimony was not a basis for the trial court’s judgment. Thus, we conclude that, whatever the merits of the PAS theory, the court’s ruling was not dependent on any finding that PAS was present in this case. We therefore need not review the trial court’s general acceptance determination and we express no opinion on the validity of that finding.

Failure to Interview the Child in Chambers

Norma argues that the trial court erred in failing to conduct an 
in camera
 interview with S.B. because the child’s account of the Florida incident was a key point in the case. Dr. Blechman acknowledged that S.B. told him her father had struck her, although he chose not to believe her. Thus, Norma contends the 
in camera 
interview could have uncovered the truth, and it is possible that it might have changed the outcome of the case. We note that this argument is not supported by any citation to legal authority as required by Supreme Court Rule 341(e)(7) (188 Ill. 2d R. 341(e)(7)).

Section 604(a) of the Act provides that the court 
may
 interview the child in chambers to ascertain the child’s wishes as to the custodian and as to visitation. 750 ILCS 5/604(a) (West 2002). That statute, however, provides no specific authority to conduct 
in camera 
interviews on other subjects. Norma argues that the court should have questioned S.B. on the Florida incident. She was not prevented, however, from calling the child as a witness on that subject. In any event, the standard of review on the decision to conduct an 
in camera
 interview is abuse of discretion. 
In re Marriage of Johnson
, 245 Ill. App. 3d 545, 554 (1993).

The trial court declined to conduct an 
in camera 
interview of S.B. because of its concern that she would be put in the position of blaming herself for the outcome. In an unpublished portion of its opinion, the appellate court agreed that risk was a meaningful one. The court also noted:

“Further, there was other evidence in this case related to the issue of whether respondent struck the child and under what circumstances. Additionally, the prejudice to petitioner in the trial court’s failing to ask the child about the alleged incident is merely speculative as we cannot assume the child would have answered in a manner favorable to petitioner. The bottom line is that the trial court clearly expressed its concern on the record in striking the balance in favor of not conducting the interview. We cannot say the balance struck by the trial court was an abuse of discretion.”

We agree with the appellate court on this issue and hold that the failure to conduct an interview in chambers was not an abuse of discretion.

Deputy Young’s Testimony

 Norma’s final argument is that the trial court erred in allowing the child’s representative to call Deputy Young as a witness because his name was not disclosed by Bush as a witness he intended to call at trial. It is within the trial court’s discretion to decide whether evidence is relevant and admissible, and a court’s determination on that issue will not be reversed absent a clear abuse of discretion. 
People v. Morgan
, 197 Ill. 2d 404, 455 (2001).

On December 20, 2001, all parties were ordered to provide opposing counsel a list of witnesses each intended to call at trial. Bush did not provide a list of witnesses, but was permitted to take the telephonic evidence deposition of Deputy Young during the trial on April 15, 2002. Norma claims that because Deputy Young’s testimony related to the Florida visitation incident, the prejudice to her is manifest. The appellate court held, however, that the lack of disclosure was not prejudicial because she was aware of the investigation by Florida authorities and had access to Deputy Young long before he was disclosed as a witness. The appellate court did not deem Deputy Young’s testimony, limited to the issue of the Florida incident, significant enough to have affected the outcome concerning custody.

We recognize the importance of compliance with discovery orders. To prevent surprise or prejudice, and where demonstrated harm results to a party, we will not hesitate to grant relief. Here we agree with the appellate court that Norma has not demonstrated any prejudice resulting from Deputy Young’s testimony. She was aware of his involvement long before trial began. Her counsel conducted an extensive and effective cross-examination, resulting in the deputy’s admissions that he could not recall asking S.B. if her father had struck her and that he did not examine the parts of her body covered by clothing. We hold, therefore, that the court did not abuse its discretion in allowing this witness to testify at trial.

Cross-Relief

Edward complains that the trial court erred in failing to grant his petition to terminate unallocated maintenance and support because the evidence established the existence of a resident, continuing, conjugal relationship between Norma and Parmod Malik. The standard of review of a support order is whether it is an abuse of discretion, or whether the factual predicate for the decision is against the manifest weight of the evidence. 
Slagel v. Wessels
, 314 Ill. App. 3d 330, 332 (2000). In other words, if the court’s exercise of discretion has an evidentiary basis, then the reviewing court will consider the manifest weight of the evidence. Each case seeking termination of maintenance based on a recipient’s conjugal cohabitation rests on its own facts, given the unique nature of each interpersonal relationship. 
In re Marriage of Sappington
, 106 Ill. 2d 456, 466 (1985). It is the burden of the party seeking termination of maintenance to demonstrate that the former spouse is involved in a continuing, conjugal relationship. 
Sappington
, 106 Ill. 2d at 467.

The appellate court reviewed the evidence and concluded that the trial court ruling was not against the manifest weight of the evidence. The court noted the evidence demonstrated that Norma and Malik were involved in an intimate, dating relationship. They spent time together, including dinner, movies, and walking. Malik admitted that on occasion he would drive one of Norma’s luxury automobiles. Despite that evidence, the two maintained separate residences. Malik only stayed at Norma’s home on a sporadic basis. The appellate court attributed no significance that Norma made advance rental payments to Malik, or that he used some of these rental checks to pay for the home.

We agree that the trial court’s determination that Norma and Malik were not in a resident, conjugal relationship is not against the manifest weight of the evidence. In 
Sappington
, this court equated a conjugal relationship to a husband- and-wife-like relationship, whether or not sexual relations took place. 
Sappington
, 106 Ill. 2d at 467. Norma and Malik did not live in the same residence, did not commingle funds, and did not vacation together. Therefore, the trial court could rationally conclude that Norma and Malik enjoyed a dating relationship not akin to marriage. Accordingly, the trial court has not abused its discretion in denying Edward’s petition to modify unallocated support. Hence, we will not disturb the trial court’s finding on this issue.

CONCLUSION

Section 506(a)(3) of the Act, as applied in this case, deprived Norma of procedural due process of law because her protected liberty interest in the care, custody, and control of her daughter was adversely affected by the statutory prohibition of calling the child’s representative as a witness and cross-examining him. Nevertheless, in light of the overwhelming expert testimony supporting a modification of custody, and because the content of the representative’s report was not inconsistent with the other evidence at trial, admission of the report was not prejudicial, and the error in failing to allow cross-examination was harmless.

In view of the sparse record challenging the general acceptance of the PAS principle, allowing Dr. Gardner’s parental alienation syndrome testimony was not an abuse of discretion. We note, however, that PAS is now the subject of legal and professional criticism, and our holding in this case does not foreclose further challenges to the validity or general acceptance of that concept in future cases.

The trial court did not abuse its discretion in refusing to interview the child in chambers, in light of the court’s expressed concern that the child might consider herself to blame for the outcome of the proceeding. Further, it was not an abuse of discretion to allow the taking and reading of the evidence deposition of Deputy Young because Norma was aware of his involvement in the case, thus resulting in no prejudice to her.

Finally, the order denying Edward’s petition to modify the unallocated support judgment was not against the manifest weight of the evidence, and the trial court did not abuse its discretion in denying the petition.

We therefore affirm the judgment of the appellate court.

Affirmed.