NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230719-U

NOS. 4-23-0719, 4-23-0720 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 25, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| KIM D. STOCK and SCOTT K. PEARCE, | ) | Appeal from the |
| Petitioners-Appellees, | ) | Circuit Court of |
| v. | ) | Whiteside County |
| KENNETH MAX PEARCE, | ) | Nos. 23OP10 |
| Respondent-Appellant. | ) | 23OP11 |
| | ) | |
| | ) | Honorable |
| | ) | Stanley B. Steines, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court reversed and remanded, finding the trial court's failure to provide respondent an opportunity to conclude his cross-examination of petitioners violated respondent's due process rights.

¶ 2    In January 2023, petitioners, Kim D. Stock and Scott K. Pearce, filed petitions for emergency and plenary orders of protection against their father, respondent, Kenneth Max Pearce, pursuant to section 214 of the Illinois Domestic Violence Act of 1986 (750 ILCS 60/214 (West 2022)). The trial court denied the emergency orders of protection.

¶ 3    Beginning in May 2023, the trial court conducted a series of evidentiary hearings on petitioners' requests for plenary orders of protection. The court entered plenary orders of protection on August 8, 2023, set to expire two years from that date.

¶ 4　　　　　Respondent appeals, arguing he was deprived of his procedural due process rights when the trial court failed to provide him an opportunity to conclude his cross-examination of Scott or confront and cross-examine Kim after they failed to appear on the sixth day of proceedings. We reverse and remand for further proceedings.

¶ 5　　　　　　　　　　　　　　I. BACKGROUND

¶ 6　　　　　In January 2023, petitioners filed petitions for emergency and plenary orders of protection, alleging respondent (1) threatened Scott, (2) brandished a firearm when petitioners arrived at 9 p.m. on March 10, 2016, "to inspect the family home [and] to inventory items in the home" where respondent lived, (3) reached for a holstered firearm while entering the post office in Erie, Illinois, on June 25, 2022, as petitioners exited, and (4) on November 13, 2022, threatened petitioners "through others" on social media after he "lured" them to an auction held at the home. The trial court denied the petitions seeking emergency orders of protection.

¶ 7　　　　　Beginning in May 2023, the trial court conducted six days of hearings over the course of several months to determine whether to grant the petitions seeking plenary orders of protection. The hearings were also consolidated with two petitions for rule to show cause, filed by petitioners, alleging respondent failed to comply with the court's orders in separate matters unrelated to the instant appeal. At the outset of the proceedings, the parties agreed respondent would "go first," and the parties "would put the witness[es] on and then do cross-examination back and forth and it would apply in all the cases." During the hearings, the court heard testimony from Scott, respondent, local community members, police officers, and family friends. The parties also submitted numerous exhibits, including a video of the encounter at the post office, which the court observed. We summarize only the evidence presented at the hearings relevant to the disposition of this appeal.

¶ 8      Respondent testified he was 91 years old. He stated he made a handshake deal with an auctioneer located somewhere in the Quad Cities to sell all his firearms—two handguns and four long guns—for $450 sometime in 2017. Respondent denied handling a firearm or owning one at any point since. He acknowledged lying to Erie's chief of police, Brian Hawk, when asked if he had ever owned a pistol during his conversation with Hawk after the post office incident. Regarding that encounter, respondent testified he was unaware petitioners were present at the post office when he picked up his mail on June 25, 2022. According to respondent, he opened the door to the building as petitioners exited. He asked petitioners if they received any mail, but they "never said a thing, they walked down to their car." Respondent then continued to hold the door for two other individuals before walking inside.

¶ 9      Following respondent's testimony, respondent's trial counsel indicated some of petitioners' witnesses were "out in the hall" and requested to "just put them on." Counsel explained, "Nobody is going to rest. We're just going to go back and forth."

¶ 10     Scott, respondent's son, then testified he and respondent "never did get along." He described respondent as "passive-aggressive." He accused respondent of being physically and verbally abusive throughout his youth. Scott testified he stopped by the post office in Erie after visiting his mother's grave on June 25, 2022. Scott and Kim went inside to pick up his mail while other family members waited outside in his vehicle. On their way out of the post office, Scott saw respondent "squared up in the doorway" with his coat "pulled back." Scott claimed respondent had his right hand by a holstered handgun on his hip. He also claimed respondent "had that look of *** I got you where I want you." According to Scott, he managed to extricate himself from the confrontation by turning sideways and "scoot[ing] to the left" to get around

respondent, while respondent "stayed in the door." Kim "came out the same way." Scott did not report the incident to the police.

¶ 11 During a break in Scott's testimony on the third day of proceedings, the trial court observed "an ambulance that had pulled up to the courthouse." Petitioner's trial counsel confirmed the ambulance was for Kim, who, counsel stated, was "crying quite hysterically [and] having a panic attack" after respondent allegedly " 'stuck his tongue out at [her].' " Counsel also alleged respondent's attorney told Kim to "go home" after the bailiff removed another individual from the courtroom. The court thereafter continued the proceedings until June 13, 2023.

¶ 12 Scott resumed his testimony at that next hearing. However, while cross-examining Scott, respondent moved for a continuance due to unanswered responses to written discovery requests about which he wished to question Scott. Over petitioners' objection, the trial court granted the motion and scheduled a hearing for July 26, 2023, to hear arguments on the matter. The court also scheduled a hearing for August 8, 2023, to resume Scott's testimony.

¶ 13 Petitioners failed to appear for the hearing on August 8, 2023. In requesting a continuance, petitioners' trial counsel mentioned Kim's previous "health episode" and told the trial court the proceedings had been "very stressful for her." According to counsel, "[I]t was not advised for [Kim] to travel up yet and that she needed more time." Counsel also explained that once Scott realized Kim—a "key witness for the events at issue"—was not going to be present, he too chose not to appear, citing a "business reason." Additionally, counsel indicated petitioners were unlikely to appear for the remaining hearing dates. Respondent objected to the continuance, arguing it was not appropriate under the circumstances because the parties had known of the current hearing date for a "long time." Respondent also noted he "had witnesses lined up for this afternoon." Ultimately, the court denied the motion to continue, noting Scott's absence was

"certainly voluntary," and it was unknown "when [Kim would] be able to ever appear in these proceedings."

¶ 14　　　　　Following the parties' closing arguments, the trial court concluded the petitions seeking plenary orders of protection had been proven. In explaining its findings, the court determined "the credibility of all parties is at issue here," despite its own recognition that it had not heard any testimony from Kim. However, the court believed it had "heard enough evidence otherwise and she was the one that [*sic*] was present at the post office." In the court's opinion, "the most serious allegation [was] *** the post office incident." The court noted respondent's acknowledgment that he lied about owning a pistol, and it was "unclear from [respondent's] testimony as to when those firearms were disposed of or sold." The court also believed respondent "did have *** a pistol" with him at the post office, which the court based "a lot *** on the lines of [respondent] lying about the direct questions as it relates to this exact investigation." The court then entered plenary orders of protection containing an expiration date of August 8, 2025.

¶ 15　　　　　This appeal followed.

¶ 16　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 17　　　　　On appeal, respondent argues he was deprived of his procedural due process rights where the trial court provided him no opportunity to conclude his cross-examination of Scott or to confront and cross-examine Kim after they failed to appear on the sixth day of proceedings. Petitioners counter by asserting respondent forfeited this issue by failing to raise it in the trial court, or, alternatively, he waived the argument when he objected to their request to continue the proceedings. Even if that was true, forfeiture is a limitation on the parties, not the court, and we may exercise our discretion to review otherwise forfeited issues. *People v. Rajner*,

2021 IL App (4th) 180505, ¶ 23, 189 N.E.3d 472. We may overlook a party's forfeiture of an issue "when necessary to obtain a just result." *Curtis v. Lofy*, 394 Ill. App. 3d 170, 188, 914 N.E.2d 248, 263 (2009). Here, the bizarre circumstances in this case highlight the need for a just result, so we choose to address this issue despite respondent's forfeiture.

¶ 18 Likewise, we decline petitioners' invitation to invoke the doctrine of invited error. The doctrine of invited error bars a party from requesting the trial court to proceed in a certain manner and later claiming on appeal that the court erred by following that request. *People v. Harvey*, 211 Ill. 2d 368, 385, 813 N.E.2d 181, 192 (2004). According to petitioners, respondent was to choose between (1) waiving any challenge to being unable to cross-examine them by proceeding with the hearing or (2) accommodating petitioners' voluntary absences without any indication they would return. However, we find it fundamentally unfair to force respondent to make such a choice, especially when respondent had witnesses scheduled to testify that day and the dilemma arose *entirely* out of petitioners' absences, for which the trial court provided no remedy.

¶ 19 Turning to the merits, we must determine whether respondent was deprived of his procedural due process rights when he received no opportunity to confront and cross-examine Kim or finish his cross-examination of Scott. "Procedural due process claims challenge the constitutionality of the specific procedures used to deny a person's life, liberty, or property." *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 201, 909 N.E.2d 783, 796 (2009). Due process is a flexible concept, which " 'calls for such procedural protections as the particular situation demands.' " *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). To determine whether a procedure comports with due process, a court must consider and balance (1) the private interests affected by the official action, (2) the risk of

- 6 -

an erroneous deprivation of that interest through the procedures used and the probative value of any additional or substitute safeguards, and (3) the governmental interest. *Mathews*, 424 U.S. at 335. We review *de novo* whether a party was denied due process. *People v. Sauls*, 2022 IL 127732, ¶ 32, 215 N.E.3d 810.

¶ 20 Regarding the first consideration, the parties do not dispute that the conditions imposed by the orders of protection directly implicate respondent's interest in his unrestricted freedom of movement. Pursuant to the orders of protection sought in this case, respondent is prohibited from having any communication with petitioners, and he must stay at least 500 feet away from them at all times. And while respondent possesses no significant interest in associating with Scott or Kim, an "important factor in assessing the impact of official action on private interests is the possible length of wrongful deprivation of *** benefits." (Internal quotation marks omitted.) *People v. Deleon*, 2020 IL 124744, ¶ 32, 181 N.E.3d 172. Here, the plenary orders of protection deprive respondent of his unrestricted movement for two years. See 750 ILCS 60/220(b)(0.05) (West 2022). Given his advanced age, a two-year order of protection could realistically impact respondent's liberty interest for the rest of his life, considering the fact that plenary orders of protection may be extended indefinitely. See 750 ILCS 60/220(e) (West 2022); *cf. Deleon*, 2020 IL 124744, ¶ 32 (finding little impact to the defendant's liberty interest where the defendant's freedom of movement prior to trial was restricted only until disposition, withdrawal, or dismissal of the pending charges). Therefore, this first factor weighs in favor of respondent.

¶ 21 Next, we must consider the risk of an erroneous deprivation of this interest given the procedures used and the value of any additional safeguards respondent requests. *Mathews*,

424 U.S. at 335. The only additional procedural safeguards respondent requests are to finish his cross-examination of Scott and to confront and cross-examine Kim.

¶ 22 Here, petitioners assume cross-examination serves only to benefit respondent. But the opportunity to question a witness and observe their demeanor while being questioned is just as important to the fact finder. "Cross-examination is the primary method by which a witness's believability and credibility may be challenged." *People v. Myles*, 2020 IL App (1st) 171964, ¶ 20, 175 N.E.3d 756. "In almost every setting where important decisions turn on questions of fact, due process *requires* an opportunity to confront and cross-examine adverse witnesses." (Emphasis added.) *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970); *In re Marriage of Bates*, 212 Ill. 2d 489, 513, 819 N.E.2d 714, 727 (2004) (stating the opportunity to cross-examine witnesses and to inspect the evidence offered against a party are part of guaranteeing the exercise of due process). "Basic notions of fair play require that the parties have the opportunity to cross-examine or refute facts which form the basis of the court's decision." *In re Marriage of Doe*, 2024 IL App (1st) 230935, ¶ 61; see *Bates*, 212 Ill. 2d at 513 (holding the petitioner's due process rights were violated when she was unable to cross-examine a witness and finding, "[w]ithout the important tool of cross-examination, [the petitioner's] means of challenging [the child representative's] observations, conclusions, and recommendations were impaired").

¶ 23 Considering the parties' competing claims and the lack of reliable evidence to support or refute petitioners' allegations, this case left the trial court with a choice between believing respondent or his accusers. Yet, the court resolved the problems regarding "the credibility of *all* parties" (emphasis added) without completely assessing Scott's credibility. What is worse, it did so and decided respondent's fate without even seeing or hearing from Kim at all, who was a "key witness" with firsthand knowledge of the events. We find this disturbing,

and it poses too high a risk respondent will be erroneously deprived of his freedom of movement in this case.

¶ 24 Finally, we consider the third factor under the procedural due process framework—the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Petitioners rely on *Deleon* to argue any governmental interest, within the context of a protective order proceeding, outweighs an accused's affected interest. But *Deleon* dealt with a challenge to the constitutionality of a statute that permits the issuance of a protective order if the trial court finds *prima facie* evidence that certain crimes have been committed, even if the defendant has had no opportunity to cross-examine the victim. See *Deleon*, 2020 IL 124744, ¶¶ 1, 22.

¶ 25 In *Deleon*, the supreme court determined the governmental interests had "vastly more weight than the implicated interests of [the] defendant," where the defendant stood accused of four counts of criminal sexual assault and was subject to the no-contact provisions set forth in article 112a of the Code of Criminal Procedure of 1963 (725 ILCS 5/art. 112a (West 2018)). *Deleon*, 2020 IL 124744, ¶¶ 3, 34. In doing so, the supreme court analyzed the *Mathews* factors and weighed the government's interest "in minimizing the number of times the alleged victim is subject to adversarial proceedings prior to trial" against the defendant's "fundamental interest *** to move about without restriction pending trial." *Deleon*, 2020 IL 124744, ¶¶ 29, 31. The supreme court reasoned that submitting victims to "multiple pretrial 'mini trials' could discourage continued cooperation from particularly reticent victims, undermining the government's ability to pursue justice for those wronged," and ultimately found the applicable

statutory procedures "in compliance with due process requirements." *Deleon*, 2020 IL 124744, ¶¶ 30, 35.

¶ 26　　　　Here, the circumstances that implicated the specific governmental interests identified by our supreme court in *Deleon* are not present. Unlike in *Deleon*, there is no pending criminal matter against respondent, so petitioners are unlikely to be required to submit to cross-examination multiple times. Moreover, any interest the government may have "in protecting victims of domestic violence," as petitioners suggest, is negligible because petitioners initiated the proceedings, which is different from a victim who may be discouraged to cooperate with the State who brought the charges. See *Deleon*, 2020 IL 124744, ¶ 30. More importantly, petitioners offer no argument as to what fiscal or administrative burden would be imposed by allowing respondent the opportunity to conclude his cross-examination of Scott and cross-examine Kim, and we can perceive none. Therefore, the third *Mathews* factor is satisfied.

¶ 27　　　　Accordingly, we agree with respondent that his procedural due process rights were violated under the specific facts of his case, insofar as the trial court granted the petitions for plenary orders of protection without providing respondent an opportunity to (1) conclude his cross-examination of Scott or (2) confront and cross-examine Kim. On that basis, we reverse the court's judgment and remand for further proceedings.

¶ 28　　　　　　　　　　　　　III. CONCLUSION

¶ 29　　　　For all these reasons, we reverse the trial court's judgment and remand the cause for further proceedings.

¶ 30　　　　Reversed; cause remanded.