NOTICE

Decision filed 12/20/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 220476-U

NO. 5-22-0476

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| KRISTEN H., n/k/a Kristen S., | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 13-F-117 |
| | ) | |
| MATTHEW W., | ) | Honorable |
| | ) | Alana I. Mejias, |
| Respondent-Appellee. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's decision modifying parental responsibilities to give sole decision-making authority over the parties' minor children to the respondent father and allocating the majority of the parenting time to him is affirmed as it was not against the manifest weight of the evidence. The court's decision denying the petitioner mother's motion to relocate with the minor children is also affirmed where the respondent father was awarded the majority of the parenting time.

¶ 2    This appeal arises out of an order modifying parental responsibilities to give sole decision-making authority over the parties' minor children to the respondent, Matthew W., and allocating the majority of the parenting time to him. It also involves an order denying a motion to relocate with the minor children filed by the petitioner, Kristen S. On appeal, Kristen S. argues that the trial court's modification of parental decision-making authority and parenting time was against the

1

manifest weight of the evidence, and the court's decision denying her relocation with the children was also against the manifest weight of the evidence.

¶ 3                                    I. BACKGROUND

¶ 4     Matthew W. and Kristen S. had two children, Ja.W., born January 14, 2006, and J.W., born July 17, 2010. In March 2018, the trial court awarded Kristen S. sole decision-making authority over the minor children and set the parenting time schedule. Also, the court denied her petition to relocate to Alaska (Kristen S.'s husband, Rick S., was employed at Elmendorf Air Force Base in Alaska as a civil service employee with the United States Air Force). In June 2019, Kristen S. filed a second petition for relocation, seeking the court's permission to relocate to Warrensburg, Missouri. The petition stated that Rick S. had been living in Alaska and had made substantial efforts to find gainful employment in St. Clair County, but those efforts were unsuccessful. However, he had obtained employment at Whiteman Air Force Base in Knob Noster, Missouri. Rick S. and Kristen S. purchased a home in Warrensburg, approximately 3½ hours from their Millstadt, Illinois, residence where Kristen S. was residing. Although they bought the Missouri residence, Kristen S. continued to reside in Millstadt until that home was sold. After the Millstadt home was sold, Kristen S. and the children moved to Maeystown, Illinois, to live with her parents. Kristen S. and Rick S. also had a daughter, Caroline S., who lived with Kristen S. while Rick S. was living in Alaska, but she moved to the Missouri house in January 2020 and began attending school there.

¶ 5     On March 19, 2020, the trial court entered an order denying Kristen S.'s petition to relocate, finding that she had failed to establish that the relocation was in the minor children's best interests. On September 21, 2020, the court entered another order, temporarily modifying the parenting time schedule because Kristen S. and the children had been living in their Missouri home during the

2

COVID-19 pandemic since the children were doing remote learning. The court indicated that the schedule would remain in effect during the remote learning period.

¶ 6 On July 30, 2021, Matthew W. filed a motion to enforce the trial court's March 2020 order and for modification of the school year parenting time schedule so that he had the majority of the parenting time during the school year. In the motion, Matthew W. stated that Belleville West High School and Millstadt School District were returning to full-time in-person learning for the 2021-22 school year, and Kristen S. continued to reside in Warrensburg. Matthew W. alleged that the current placement schedule when school resumed would be impossible to maintain and that it was not in the minor children's best interests to be transported to and from Warrensburg. That same day, Matthew W. also filed a petition to modify parental responsibilities, requesting sole decision-making authority over the children.

¶ 7 On August 13, 2021, Matthew W. filed an emergency petition to enforce the court order, alleging that Kristen S. had not responded to his inquiries about enrolling the children into their Illinois schools, and the children had told him that she intended to enroll them in school in Warrensburg. On August 26, 2021, the trial court entered an order, requiring that the children be enrolled in Belleville West High School and Millstadt School District immediately and for Matthew W.'s address to be used for school purposes. On May 17, 2022, Kristen S. filed another motion to relocate the children.

¶ 8 On June 22, 2022, a hearing was held on Matthew W.'s motion to modify parental responsibilities and Kristen S.'s motion to relocate. At the hearing, Matthew W. testified that, once it was announced that the children's schools were returning to in-person learning, he sent multiple text messages to Kristen S. about enrolling them and where they would be staying. Kristen S.'s answers were not responsive, she never registered them in the Millstadt and Belleville

3

schools, and she instead enrolled them in Warrensburg schools. He had to go to both schools to get them registered and enrolled in their classes because Kristen S. had their records transferred to the Warrensburg schools.

¶ 9    Although Kristen S. told Matthew W. that she went to the Illinois schools to register the children, he believed she went there to talk about continuing remote learning. Neither Illinois school was offering remote learning for the 2021-22 school year unless there was a special circumstance. However, Matthew W. acknowledged that he did receive a message from Kristen S. about needing proof of his address before the children could be registered in school.

¶ 10    Once in-person school resumed, the parenting time schedule reverted back to the schedule set out in the trial court's March 2020 order. However, there were issues with the schedule because Kristen S. took the children to Warrensburg on her weekends, sometimes taking them out of school early on Friday, and did not return them until early Monday morning. During the 2021-22 school year, J.W. had 23 absences from school, one or two of which were when J.W. was sick while at Matthew W.'s house, and Ja.W. had 14 absences, one or two of which were when she was also sick while at Matthew W.'s house. However, Matthew W. acknowledged that J.W. missed at least five days of school because he was quarantined due to COVID-19. Matthew W. noted that, when J.W. tested positive for COVID, the quarantine period was 10 days. During J.W.'s quarantine period, the quarantine period was reduced to five days, but Kristen S. still kept him out of school for 10 days. Kristen S. obtained medical providers for the children in Warrensburg, and there had been times where she took both children out of school because one of them had a doctor or dentist appointment.

¶ 11    Even with the absences, Ja.W. was doing well in school; she was enrolled in honors courses and had a 4.75 grade point average. J.W. was also doing well, had an approximately 3.75 grade

4

point average, and ended the semester with As and one B. Neither child participated in extracurricular activities because Kristen S. would not allow them. Ja.W. played volleyball in grade school, but the last time she played was in seventh grade, and J.W. previously played baseball. Matthew W. acknowledged that Ja.W. tried out for the volleyball team in eighth grade but did not make the team. However, Ja.W. had an opportunity to try out for a select team, but Kristen S. would not let her try out for that team. When he asked Kristen S. about J.W. playing baseball, she refused to give permission and said she was going to contact the school to let them know that J.W. did not have permission to play.

¶ 12    Since Ja.W. started driving, she was driving herself and J.W. to school. On days that her school started later, she had to wait after dropping J.W. off at his school until she could go to school. When he talked to Kristen S. about it, she said that it saved gas money. There had also been issues with the children forgetting items that they needed for school in Warrensburg.

¶ 13    Matthew W. took Ja.W. to a dermatologist because she had acne, and the dermatologist gave her two medications. However, Kristen S. would not let Ja.W. take the medication and was angry because Matthew W. took Ja.W. to the doctor behind her back. He explained that he could not take the children to any of their medical appointments because they were all in Warrensburg.

¶ 14    Matthew W. believed that it would be easier if he had the majority of the parenting time during the school year, so then the children would not have to live with their grandparents. He explained that he felt that the children were missing out by not living in the community where they attended school, and it would be easier for them to get to school if they lived with him. He noted that the Millstadt community was the most stable thing they had, and the children loved it there. J.W. had friends who lived within walking distance of the house, and Ja.W. also had friends in the area. Matthew W. explained that the current summer schedule did not allow the children to

5

participate in summer sports or other extracurricular activities and allowing Kristen S. the majority of the parenting time in the summer meant that the children were not able to see their friends or extended family. He noted that the majority of their friends, cousins, aunts, uncles, and grandparents lived near him. If the children moved to Warrensburg, they would have to change schools. He had never heard the children talk about any friends in Warrensburg.

¶ 15 Matthew W. and his wife had two children, ages six and three, and Ja.W. and J.W. had a great relationship with his wife and loved their half-siblings. His wife was a director of a preschool, and she had flexibility to go home during the day. During the pandemic, the children did remote learning at his house when they were there. He acknowledged that the children also loved Rick S. and Caroline S.

¶ 16 Kristen S. testified that she was unemployed, she was the children's main caretaker for their entire lives, and she had always made their doctor and dentist appointments. Matthew W. had never shown any interest in being involved in those appointments. Ja.W. was going to an orthodontist in Warrensburg because she had gotten braces there before Kristen S.'s request to relocate was denied, and they had already paid for the braces and the follow-up appointments. They initially went there because the orthodontist offered a military discount, and Ja.W. really liked it. Matthew W. was not contributing to that cost, and they could not afford to find a new orthodontist in Illinois. Kristen S. explained that the children's dentist was in Warrensburg because that dentist was cheaper than the dentists she contacted in Illinois; she had to pay for the appointments herself since they did not have dental insurance, and Matthew W. was not contributing to those costs. Although Matthew W. paid child support, he did not pay any additional expenses for the children.

¶ 17    In July 2020, Matthew W. requested to start his parenting time early so he could go on a family vacation with the children. Ja.W. had an orthodontist appointment during that time, and he agreed to take her. However, once he got the children, he canceled the appointment, and it could not be rescheduled until September. Kristen S. explained that the orthodontist appointments were difficult to get because they were scheduled three months in advance, and the office was not open on Mondays or Fridays.

¶ 18    Kristen S. testified that Ja.W. had issues with acne, and, when Kristen S. asked the doctor whether she should take Ja.W. to a dermatologist, the doctor told her no and that Ja.W. should continue to use the skin care products that she was using. Ja.W.'s acne had improved and was now just an issue once per month. After that doctor's appointment, Matthew W. took Ja.W. to a dermatologist against Kristen S.'s wishes. The dermatologist gave them a topical cream and an antibiotic for the acne. However, Kristen S. was hesitant about the prescription medication because she discovered that the acne might be worse after the patient stopped taking it, and she was unable to ask the dermatologist any questions about the medication as Matthew W. had left her off the paperwork. Matthew W. had even agreed that he did not want Ja.W. taking the prescription medicine.

¶ 19    Kristen S. acknowledged that J.W. had missed school due to Ja.W.'s orthodontist appointment, but she explained that she asked Matthew W. to meet her that Sunday so he could get J.W. and make sure J.W. got to school. However, Matthew W. refused and instead wanted her to drive to Millstadt and then back to Warrensburg to get Ja.W. to her appointment. She explained that it was not ideal, but she was doing the best she could, and Matthew W. was not willing to go a little out of his way to help her. The children's doctor was in Illinois, and she always took them

7

to those appointments. Even though she was the parent taking the children to their appointments, she communicated with Matthew W. about those appointments.

¶ 20    As for the rest of J.W.'s absences from school, Kristen S. explained that he missed 10 days of school because he was quarantined. She noted that she called his school, and the school nurse told her when he could return. Toward the end of the quarantine period, the period was reduced to five days, but the school nurse told her to just have him return on the original date.

¶ 21    Kristen S. was very close with Ja.W., and they liked to thrift shop, hike, bike, watch movies, and listen to music. She was also close to J.W., he liked to fish, and Rick S. went fishing with him. There was only a two-year age difference between J.W. and Caroline S., so they were really close and were always together. J.W. was a good big brother, and Caroline S. looked up to him and wanted to do the same activities that he did, such as playing with Nerf guns and playing video games. They played video games with his Illinois friends, so she knew those friends. However, they did not see each other as much anymore since the in-person learning had resumed; J.W. had gotten emotional about missing her. Ja.W. was not as close to Caroline S. as J.W. because of their age difference, but they still had a sweet relationship.

¶ 22    After the request to relocate to Alaska was denied, Rick S. applied for several jobs, and the Whiteman Air Force Base job was the closest one to Matthew W. Kristen S. was devastated when she received the trial court's denial of her request to relocate in March 2020, and she was not sure what she was going to do because they did not have enough money to maintain two households. However, the schools then shut down because of the COVID-19 pandemic, and her parents were considered high risk, so she moved the children to Warrensburg. Matthew W. initially had an issue with her moving, but then they agreed to start the summer schedule early, and he had more time with the children. From March 2020 through May 2021, the children did remote learning.

¶ 23    As for the 2021-22 school year, Kristen S. explained that she thought the school would offer remote learning since the COVID-19 numbers were increasing due to the new variant. When Matthew W. asked her about enrolling the children in school, she noted that she did not have a plan because things were frequently changing. She eventually went to Ja.W.'s school to register Ja.W., but she was unable to because she needed proof of address in that school district. She acknowledged that she asked about remote learning while there but explained that she was there to register Ja.W. for school. After she was told that she needed proof of address, she tried calling Matthew W. from her cell phone and also from the school telephone, but he did not answer. Ja.W. even tried calling him. She acknowledged that she waited until the last minute to register Ja.W. but explained that she was hoping they would offer remote learning because of the increase in COVID numbers.

¶ 24    With regard to J.W.'s school, Kristen S. did not receive any communication from the school about registration because Matthew W.'s address was used for school purposes. Matthew W. had given Ja.W. the registration paperwork, but Ja.W. never gave it to her. Matthew W. eventually gave her the paperwork. Because neither child was registered at any school in August, she panicked and registered them in Warrensburg schools.

¶ 25    The children were currently doing in-person learning and were living at Kristen S.'s parents' house with Kristen S. Ja.W. drove her and J.W. to school, which was an approximately 35-minute drive. Kristen S. described the town where her parents lived as small and sleepy; she noted that it was an older community. The only connection that the children had to the town were their grandparents. Ja.W. was in honors classes and had a lot of homework every night. Kristen S. believed that Ja.W. would be unable to stay caught up on her homework and also play a sport while living at her grandparents' house.

¶ 26     During the week, they lived out of suitcases, and Kristen S. and J.W. shared a bedroom. Ja.W.'s bedroom was also her grandmother's office, so if her grandmother was working late, she would not have access to her bedroom. Kristen S. explained that they felt like visitors at her parents' house and that they were invading her parents' space. The living arrangement was meant to be temporary, but she could not afford another residence in the Millstadt school district so the children could go to school there. Although Matthew W. accused her of not being in Illinois when the children were there, she was always there with them. When staying in Illinois, she did not have Rick S. for support; she was a single mother.

¶ 27     Kristen S. explained that, during remote learning, the family were all in the same house, the children had stability, and they were able to do activities together. The children had a great relationship with Rick S. and maintained that relationship when he lived in Alaska. J.W. was really close to Rick S. because they liked to do the same things, such as fishing. Kristen S. described Rick S. as really patient.

¶ 28     The children loved Warrensburg, there were children in the neighborhood that J.W. played with, and they lived one hour from a lake. They liked to bike on the bicycle trail near the house, they hiked at a nearby state park, and they frequently went boating. J.W. liked going to the skate park, and he did ninja warrior training at a local place that also had baseball batting cages. He met a friend while boating, and they frequently met up while at the lake. Although the neighborhood was small, there were a lot of children living there. There was also a lake across the street from their house where the neighborhood children went fishing. Ja.W. wanted to do jujitsu, and there was a place nearby where she could do that. Ja.W. had her own bedroom with an attached bathroom in the basement. Ja.W. did not have as many friends there as J.W., but Kristen S. believed that Ja.W. would make friends if she went to school there. Also, the children's cousins

visited them, and Kristen S.'s sister had a house on the Lake of the Ozarks, which was close to them. Her parents also visited them and went with them to the lake in the summer.

¶ 29     When Ja.W. was younger, she participated in a lot of activities, such as volleyball, soccer, and karate. She was asked to join the select volleyball team between seventh and eighth grade, but she did not want to join because her friend was not joining. Kristen S. explained that the select team was expensive and required a lot of travel, but she was willing to let Ja.W. join if Ja.W. wanted. Then, in eighth grade, Ja.W. did not make the school volleyball team. J.W. was not committed to any sports or activities and would frequently change his mind about what activities he wanted to do.

¶ 30     Kristen S. stated that she spoke to the counselor at Warrensburg about the classes offered there compared to Belleville West High School. Belleville West High School had more honors classes, but the Warrensburg school offered advance placement and dual credit classes that were comparable to Ja.W.'s classes in Belleville. Kristen S. acknowledged that the Belleville school offered 19 advance placement classes while the Warrensburg school only offered five; she also acknowledged that Ja.W. was not currently interested in those five subjects. However, the Warrensburg schools offered 25 different honors courses that Ja.W. could take. Kristen S. believed that Ja.W. would succeed no matter which school she attended. Kristen S. noted that there were a lot of fights at the Belleville school and less violence in the Warrensburg schools. She also visited the school that J.W. would attend, and the school offered more sports than the Millstadt school, it had a brand-new gym, and the teachers and the principal were all nice. She noted that the school was comparable to the Millstadt school.

¶ 31     Kirsten S. believed it would be better for the children to relocate with her to Warrensburg because they had always lived with her, she always took care of their emotional well-being, they

11

should be reunited with their sister, and they should have an opportunity to make friends there and be part of the community. She believed that they would do well wherever they lived. She explained that it was chaotic for the children to live as they were. If they lived in Warrensburg, they would have a home base and a community that they belonged to; with the current situation, they did not have a home base because they were not at any one house long enough. However, she acknowledged that they had never expressed any dislike of Millstadt. It would also be beneficial for her because she was separated from her husband and youngest child, and she did not believe it would have an impact on Matthew W.'s parenting time.

¶ 32 Rick S. testified that he was a federal civil service employee at the Whiteman Air Force Base and that he worked for the civil engineer squadron. His job was very specialized, and Scott Air Force Base did not employ federal workers in that field. He was originally from Belleville, and he visited about once per month. When they were looking for houses to buy in the Warrensburg area, the children went with them and gave input on the homes. The neighborhood was diverse, there were a lot of children living there, and it was family orientated. The town park had a community center with a lazy river, water slides, and a swimming pool; there were also skate parks, tennis courts, and basketball courts at the park; and there was another park nearby where Kristen S. and the children went walking. The Warrensburg schools were good and had several advance courses. There was also the Missouri A+ program for top tier students, which both children would qualify for, that offered two years of free college after graduation.

¶ 33 While the children were home doing remote learning, Rick S. spent more quality time with them. He was around during the day to help them with their schoolwork, and they were able to do more family activities, such as hiking, biking, and swimming. The parenting time exchanges were also smoother during the pandemic. The crime rate in Warrensburg was low, although he

12

acknowledged that Millstadt likely had a comparable crime rate. They purchased a boat during the pandemic because they were looking for ways to spend quality time together, and they went boating at least once per week. They often had family members visit.

¶ 34 Rick S. testified that the children often came to him for advice, and they looked up to him. His relationship with the children flourished during the pandemic, and Caroline S. thrived having her siblings with her. The current parenting time schedule was disruptive to his marriage and to the children, including Caroline S. He believed that it was best for all three children to live together. He bought Ja.W. a vehicle and also paid for her braces.

¶ 35 On July 13, 2022, the trial court entered a written order, finding that Matthew W. had shown, by a preponderance of the evidence, that there had been a substantial change in circumstances that necessitated modification of parental responsibilities to serve the children's best interests. The court noted that the excessive school absences for both children, Kristen S.'s denial of the children's involvement in any extracurricular activities, and her failure to share medical information with Matthew W. were a few examples that supported a modification of parental decision-making authority. The court also noted that both parties testified that the current parenting time schedule was not working.

¶ 36 The trial court also found that it was in the children's best interests for Matthew W. to be allocated sole decision-making authority and the majority of the parenting time. In support of its decision, the court noted that there was no evidence presented as to the children's wishes; they resided in three different locations; while in Warrensburg, J.W. spent a lot of time interacting with his Millstadt friends through video gaming; and Ja.W. did not have any real friends there. During the school year, the children lived with Kristen S. and their maternal grandparents in a sleepy town, they lived out of suitcases, Kristen S. and J.W. shared a bed; and although the children were well-

13

adjusted to their home in Warrensburg, Millstadt had been a consistent location throughout their lives. The court noted that the children had good relationships with all of their half-siblings.

¶ 37 The trial court also noted that the children were well-adjusted to their schools; they had attended school in the same school district since kindergarten; Kristen S. violated a court order by enrolling them in Warrensburg schools for the 2021-22 school year, which required Matthew S. to file two motions to compel her compliance with the order for school enrollment; and the children were enrolled in the Illinois schools shortly after the school year started. The children both had excessive school absences in the 2021-22 school year, and most of those absences occurred while in Kristen S.'s care. On Kristen S.'s weekends, they left Warrensburg on Monday morning at 3 or 4 a.m. to attend school, and, at times, she pulled them out of school early on Fridays immediately preceding her weekend parenting time. The court found that, since the entry of the March 2020 order, both parents had been heavily involved in the children's education and assisted with remote learning.

¶ 38 The trial court found significant that the children were not involved in any extracurricular activities, although they lived in Maeystown and Millstadt on school days, Kristen S. was unemployed, and Ja.W. had a vehicle. Matthew W. claimed that Kristen S. would not allow them to participate in any activities, and she threatened to file a contempt motion against him if he enrolled them in any activity. She also contacted the school just to advise them that Matthew W. had no decision-making authority with regard to the children.

¶ 39 The trial court noted that Kristen S. acknowledged that the children had more established and closer relationships with their Millstadt friends. They also had extensive family in the area, including maternal, paternal, and stepparent relatives, with whom they were close. The court found that the parties did not have the ability to communicate or make joint decisions and even the

14

most benign communications were interpreted as a "call to arms." The court also found that, since it denied Kristen S.'s first request to relocate to Warrensburg, her decision-making on behalf of the children had been questionable. However, the court acknowledged that Kristen S. had historically been the primary parent with the majority of the parenting time, the children had always lived with her, and she had always taken them to their doctor and dentist appointments.

¶ 40　The trial court found that the children needed consistency and acknowledged Kristen S.'s testimony that during the remote learning period, they had stability and certainty because they were not running between three different households. During the pandemic, they had substantial time with each parent and were able to establish a routine. Although Kristen S. believed that the only solution was to grant her relocation request, the court noted that the one consistent thing for the children, other than their parents, had been the Millstadt community, and all that went with it, *i.e.*, their family, school, and friendships. The court found that Kristen S. was the parent who seemed to consistently interrupt the children's stability, noting that she requested to relocate on three separate occasions and refused to register them in the court-designated schools.

¶ 41　As for Kristen S.'s petition to relocate to Warrensburg, the trial court denied her request since Matthew W. was the parent with the majority of the parenting time, and Kristen S. did not present any different facts from those initially presented in her previous request to relocate. Kristen S. appeals the court's allocation of parental responsibilities as well as the denial of her request to relocate.

¶ 42　　　　　　　　　　　　II. ANALYSIS

¶ 43　A. Allocation of Parental Decision-Making Authority and Parenting Time

¶ 44　Section 610.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) sets forth the requirements for modification of orders allocating parental decision-making responsibilities

15

and parenting time. 750 ILCS 5/610.5(c) (West 2020). Specifically, section 610.5(c) provides that

> "the court shall modify a parenting plan or allocation judgment when necessary to serve the child's best interests if the court finds, by a preponderance of the evidence, that on the basis of facts that have arisen since the entry of the existing parenting plan or allocation judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests." *Id.*

¶ 45    Accordingly, the court may modify parenting time or the allocation of parental responsibilities if a substantial change has occurred in the circumstances of the children or either parent since the existing allocation judgment was entered and such a modification is necessary to serve the children's best interests. *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 43.

¶ 46    Once a substantial change in circumstances has been found, the trial court must determine whether modification is necessary to serve the children's best interests. 750 ILCS 5/610.5(c) (West 2020). In determining the children's best interests for modifying parenting time, the courts consider the following best-interest factors set forth in section 602.7(b) of the Act: (1) the parents' wishes; (2) the children's wishes; (3) the amount of time each parent spent performing caretaking functions with respect to the children in the 24 months preceding the filing of the petition; (4) any prior agreement or course of conduct between the parents; (5) the interaction and interrelationship of the children with their parents and siblings or any other significant person; (6) the children's adjustment to home, school, and community; (7) the mental and physical health of all involved; (8) the children's needs; (9) the distance between the parents' residences, the cost of transporting, the families' daily schedules, and the ability of the parents to cooperate; (10) whether a restriction on parenting time is appropriate; (11) physical violence or threat of physical violence; (12) the willingness and ability of each parent to place the needs of the children ahead of his or her own needs; (13) the willingness of each parent to facilitate and encourage a close and continuing

16

relationship between the other parent and the children; (14) the occurrence of abuse against the children or other members of the household; (15) whether one of the parents is a convicted sex offender; (16) the terms of a parent's military family-care plan; and (17) any other factor that the court expressly finds to be relevant. *Id.* § 602.7(b); *In re Marriage of Adams*, 2017 IL App (3d) 170472, ¶ 20.

¶ 47 To determine the children's best interests for the modification of the allocation of parental decision-making authority, the trial court must consider all relevant best-interest factors, including: (1) the children's wishes; (2) the children's adjustment to home, school, and community; (3) the mental and physical health of all individuals involved; (4) the parents' ability to cooperate to make decisions; (5) the level of each parent's participation in past significant decision-making about the children; (6) any prior agreement or course of conduct between the parents regarding decision-making; (7) the parents' wishes; (8) the children's needs; (9) the distance between the parents' residences; (10) whether a restriction on decision-making is appropriate; (11) the willingness and ability of each parent to facilitate and encourage a relationship between the minor children and the other parent; (12) the physical violence or threat of physical violence directed against the children; (13) the occurrence of abuse against the children or other member of the children's household; (14) whether one parent is a sex offender or resides with a sex offender; and (15) any other factor that the court expressly finds to be relevant. 750 ILCS 5/602.5(c) (West 2020).

¶ 48 The trial court's decision regarding whether to modify the allocation of parental decision-making authority and parenting time is subject to a manifest weight of the evidence standard of review. *In re Marriage of Bates*, 212 Ill. 2d 489, 515 (2004). This decision is afforded great deference because the trial court is in a superior position to judge the credibility of the witnesses and determine the children's best interests. *Id.* at 516. A judgment is against the manifest weight

17

of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 49    In this case, the trial court found that Matthew W. had shown, by a preponderance of the evidence, that there was a substantial change of circumstances necessitating a modification of parental responsibilities to serve the children's best interests. The court also found that it was in the children's best interests for Matthew W. to have the sole decision-making authority and the majority of the parenting time. After reviewing the record, we find that the court's decisions were not against the manifest weight of the evidence.

¶ 50    Kristen S. and Matthew W. agree that there was a substantial change of circumstances in that the current parenting schedule was not working since Kristen S.'s residence was in Missouri and the children were required to attend school in Illinois. Thus, both parties agreed that it was in the children's best interests for it to be modified. In its written order, the trial court evaluated all of the relevant best-interest factors for its decision regarding the modification of the allocation of parental decision-making and parenting time. The court made explicit reference to the number of school absences for both children, Kristen S.'s failure to share medical information, and the children's lack of involvement in extracurricular activities, but those were just a few reasons for the basis of the court's decision.

¶ 51    More importantly, with the current arrangement, the children were living out of three different households, and, as Kristen S. admitted, these living arrangements were chaotic for the children and made it harder for them to participate in extracurricular activities or establish ties in the community. The children had attended the same school district their entire lives; the majority of their friends were in the Millstadt community; they were living out of suitcases during the week;

18

it was a 35-minute drive from their grandparents' residence to their schools; they did not have their own bedrooms or space in that residence; and other than their grandparents, they did not have any ties to Maeystown, which was described by Kristen S. as being a "sleepy town" without a lot of children. Also, on Monday mornings after spending the weekend with Kristen S., the children had to leave the Missouri house at 3 or 4 a.m. to get to their Illinois schools.

¶ 52 Although the children were close to Caroline S. and Rick S., they were also close to their other half-siblings and Matthew W.'s wife. They also had extended family that lived near their Millstadt home, including their maternal grandparents. Although there is a presumption in favor of retaining the current custodian to promote stability and continuity in the children's environment (see *In re Marriage of Pfaff*, 250 Ill. App. 3d 265, 268 (1993)), the trial court found a modification was necessary to provide the children with needed consistency. The court also found that the one consistent thing for the children, other than their parents, was the Millstadt community, which included their family, school, and friendships. The court, pointing to the fact that Kristen S. enrolled the children in the Missouri school in violation of its order, found that Kristen S. was the parent who consistently interrupted the children's stability. In making this decision, the court thoughtfully weighed all of the relevant best-interests factors, and we will not second guess the court's evaluation of the relevant factors. Thus, based on the above, we find that the trial court's modification of parental decision-making authority and parenting time was not against the manifest weight of the evidence.

¶ 53                         B. Relocation Decision

¶ 54 Kristen S. also contends that the trial court's decision denying her relocation with the children was against the manifest weight of the evidence. A parent who has been allocated a majority of parenting time or equal parenting time may seek to relocate with the minor children.

19

750 ILCS 5/609.2 (West 2020). However, since the trial court awarded Matthew W. the majority of the parenting time, and we have affirmed that decision as discussed above, we also affirm the court's denial of Kristen S.'s request to relocate.

¶ 55                                    III. CONCLUSION

¶ 56    For the foregoing reasons, the judgment of the circuit court of St. Clair County is hereby affirmed.


¶ 57    Affirmed.